UNITED STATES of America,
et al., Plaintiffs,

v.

John C. YORK, et al., Defendants.

Civ. No. 93–839 (CRR).

United States District Court,
District of Columbia.

May 30, 1995.

Opinion Amending Judgment and Denying
Reconsideration July 18, 1995.

Jeffrey T. Sprung, Hagens & Berman, Seattle, WA, for plaintiffs, along with Sam W. McCahon, Sp. Asst. U.S. Atty., Washington, DC. On briefs were Sally M. Rider, former Asst. U.S. Atty., along with Eric H. Holder, Jr., U.S. Atty., and John D. Bates, Asst. U.S. Atty., Washington, DC. Of counsel were Harold J. Gross, Sr. Tax Atty., U.S. Dept. of Housing and Urban Development, as well as Pamela J. Bethel and Barbara E. Nicastro, Bethel & Nicastro, P.C., Washington, DC.

Carol A. Jamison presented oral argument in support of brief amicus curiae of Participants Trust Co. On brief was Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City.

Louis Cohen, Wilmer, Cutler & Pickering, Washington, DC, for Counterdefendant York Associates, Inc., defendant John C. York, Jr., and defendant First Commonwealth Sav. Bank. With him on briefs were David P. Donovan, Wilmer, Cutler & Pickering, Washington, DC, and John J. Knapp, Powell, Goldstein, Frazer & Murphy, Washington, DC.

Joseph E. Breen, Breen & Bartlett, P.C., Norwalk, CT, and Steven D. Gordon, Michael Martinez, Holland & Knight, Washington, DC., appeared on behalf of defendant USGI, Inc.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ................................................ 1120
PROCEDURAL BACKGROUND ...................................... 1121
FACTS ...................................................... 1122
    A.  The Parties ........................................ 1122
    B.  The Quail Run Transaction ......................... 1122
        1)  York Associates' Agency Relationship with Ginnie Mae ........... 1122
        2)  The York–USGI Agreement ...................... 1123
        3)  The Quail Run Security Purchase and Redemption .............. 1123
    C.  The Forest Isle Transaction ....................... 1124
DISCUSSION ................................................. 1125
    I.  THE COURT FINDS THAT YORK ASSOCIATES VIOLATED ITS FIDUCIARY DUTY OWED TO GINNIE MAE WHEN IT PURCHASED QUAIL RUN, A SECURITY YORK ASSOCIATES SERVICED FOR THE GOVERNMENT ........................ 1125
        A.  In Purchasing the Quail Run Security, York Associates Acquired an Interest in Conflict With the Interests of the United States .... 1125
        B.  A Subservicer's Purchase and Redemption of Securities it Services for Ginnie Mae Frustrates the Statutory Purpose of the GNMA

Mortgage–Backed Securities Program, Which is to Fund Low-and Middle–Income Housing ...................................1129

C. The Proper Remedy for York Associates' Breach of its Fiduciary Duty to Ginnie Mae in Connection with the Quail Run Transaction is Disgorgement of the Profits it Obtained in Said Transaction and Forfeiture of the Agency Fees that GNMA Paid York Associates as Subservicer ...........................................1130

II. THE COURT FINDS THAT YORK ASSOCIATES' PURCHASE OF THE FOREST ISLE SECURITY CREATED A CONFLICT OF INTEREST IN VIOLATION OF ITS FIDUCIARY DUTY OWED TO GNMA AS AN APPROVED ISSUER OF GINNIE MAE MORTGAGE–BACKED SECURITIES ....................................1132

A. Issuers are Agents of GNMA for Purposes of Administering GNMA–Guaranteed Mortgage–Backed Securities ..................1132

B. York Associates Breached its Fiduciary Duty to GNMA When, Having Caused a Default on the Forest Isle Loan, it Purchased and Redeemed the Forest Isle Security..........................1134

III. YORK ASSOCIATES' UNCLEAN HANDS WARRANT A COMPLETE DENIAL OF ANY MONETARY RELIEF IN CIVIL ACTION NO. 91–3094 ...........................................1136

CONCLUSION ....................................................1139

## INTRODUCTION

Before the Court are cross-Motions for Summary Judgment.[1] Broadly speaking, the key question presented in said Motions is whether an issuer or subservicer of Ginnie Mae securities may itself purchase Ginnie Mae securities that it issues or services, thereby profiting from Ginnie Mae on the redemption of the securities. The Plaintiffs contend that, by engaging in such activity in connection with two particular mortgage-backed securities, Counterdefendant York Associates engaged in a conflict of interest in violation of a fiduciary duty it owed to Ginnie Mae as an issuer and subservicer of Ginnie Mae securities. The Plaintiffs further allege that York Associates' breach of fiduciary duty was induced by Defendants John C. York, First Commonwealth, and USGI, Inc.

More specifically, Plaintiffs United States of America and the Government National Mortgage Association ("GNMA" or "Ginnie Mae") (collectively, "the Government") argue that (1) York Associates violated its fiduciary duty owed to GNMA when it purchased a security York Associates serviced for the Government ("Quail Run"); and that (2) in purchasing another security ("Forest Isle"), York Associates violated a Ginnie Mae rule that purportedly prohibits an issuer of GNMA mortgage-backed securities who occupies a fiduciary relationship with GNMA from purchasing from private investors the securities it issues and services.[2]

As relief, the Government seeks disgorgement of profits earned by York Associates on the Quail Run securities transaction, as well as forfeiture of all fees received by York Associates under the Sub–Contract Servicing Agreement it had with GNMA. Moreover, the Government urges the Court to deny York Associates any monetary relief in a related case, Civil Action No. 91–3094 (which has been consolidated with the instant litigation) or, alternatively, to offset the $795,-681.00 in profits gained on the Forest Isle transaction against any damages the Court might otherwise award in that matter because, according to the Government, the York Parties have "unclean hands."

---

1. The Court also granted Participants Trust Company ("PTC") leave to file a brief *amicus curiae* in this action, and recognized counsel for PTC at oral argument on the instant Motions.

2. The Government also inconsistently sprinkles its briefs with reference to the "Stoneybrook/Kentwood Square" transaction. While no party mentioned this transaction at oral argument, the facts surrounding the same are not included in the parties' Joint Statement of Facts Not in Dispute. The Court shall therefore not address Stoneybrook/Kentwood Square, as it appears to be immaterial to the key claims raised by the parties and, in turn, to the Court's rulings herein.

The Defendants,[3] on the other hand, assert that York Associates breached no implicit duty of its relationship to Ginnie Mae and that, in any event, the extensive relief sought by the Government in this case is not supportable even if there were such a breach. In particular, Counterdefendant York Associates, Defendant John C. York, Jr., and First Commonwealth Savings Bank ("York Parties," collectively), move for (1) summary judgment dismissing the counterclaim by the Government National Mortgage Association in Civil Action No. 91–3094,[4] as well as the Complaint filed by GNMA and the United States against John York and First Commonwealth in the above-captioned suit, Civil Action No. 93–839;[5] (2) summary judgment dismissing the "unclean hands" defenses alleged in Civil Action No. 91–3094; and (3) "further necessary and proper relief," pursuant to 28 U.S.C. § 2202, based on the Court's declaratory judgment entered in Civil Action No. 91–3094. Such further relief, in particular, would be in the form of an Order directing the Department of Housing and Urban Development ("HUD") to pay to York Associates supplemental insurance benefits calculated pursuant to said declaratory judgment.

For the reasons set forth herein, the Court shall grant the Government's Motion for Summary Judgment, and deny the Defendants Motions, which include York Associates' request for "further necessary and proper relief" in Civil Action No. 91–3094. As a remedy for York Associates' breach of fiduciary duty owed Ginnie Mae and its co-Defendants' inducement of the same, the Court shall require disgorgement of the profits York Associates obtained in the purchase and redemption of the Quail Run security, and shall direct York Associates to forfeit all fees it received from GNMA under the Sub-Contract Servicing Agreement.

3. While, as further explained below, York Associates is technically a Counterdefendant in Civil Action No. 91–3094, the Court, for ease of explanation and where appropriate, shall refer to York Associates, John C. York, First Commonwealth and USGI, Inc., collectively, as the "Defendants."

4. As mentioned previously, this related suit was consolidated with the instant litigation. *York Associates, Inc. v. Secretary of Housing and Urban Development*, 820 F.Supp. 14, 20 (D.D.C.1993).

## PROCEDURAL BACKGROUND

York Associates, Inc. was a multifamily mortgage lender that issued mortgage loans insured by HUD pursuant to "contracts of coinsurance" authorized by Section 244 of the National Housing Act, 12 U.S.C. § 1715z–9. In December 1991, York Associates filed Civil Action No. 91–3094, a suit against HUD and the Government National Mortgage Association regarding the calculation of mortgage insurance benefits payable by HUD to York Associates in connection with twenty separate coinsurance loans made by York Associates on which borrower defaults had occurred.

HUD and GNMA filed an Answer alleging "unclean hands" and several other affirmative defenses.[6] Thereafter, HUD and GNMA filed an amended Answer which added a permissive counterclaim by GNMA against York Associates based on an alleged breach of fiduciary duty by York Associates under a Sub–Contract Servicing Agreement between York Associates and GNMA.

GNMA and the United States also filed a separate action, Civil Action No. 93–839, against John C. York individually, First Commonwealth Savings Bank, and USGI, Inc., alleging that each had "induced" the breach of duty by York Associates and were jointly liable therefor.

The Court on Motions for Summary Judgment found for York Associates on the question of statutory construction, but declined to grant any relief other than a declaration of the meaning of the statute, reasoning that the resolution of the instant suit, as well as the counterclaim and defense raised by the Government in the first suit, may affect the parties' rights to monetary relief. *York As-*

5. Defendant USGI, Inc. joins with Defendants John C. York, Jr. and First Commonwealth Savings Bank in moving for summary judgment dismissing the Complaint in Civil Action No. 93–839.

6. In light of the Court's ruling contained herein, the Court shall assume that the remaining affirmative defenses raised in the Government's Answer in Civil Action No. 91–3094 are now moot.

*sociates, Inc. v. Secretary, Dep't of Housing and Urban Development*, 820 F.Supp. 14 (D.D.C.1993). The Court also consolidated the injunctive relief phase of York Associates' case with the Government's new case, which is now before the Court as Civil Action No. 93–839. *Id.*

## FACTS [7]

### A. The Parties

The Government National Mortgage Association is a wholly-owned government corporation within HUD. 12 U.S.C. § 1717(a)(2)(A). Ginnie Mae administers the mortgage-backed securities program, which is authorized under section 306(g) of the National Housing Act. 12 U.S.C. § 1721(g).

Counterdefendant York Associates, Inc. ("York Associates") was at all relevant times an approved issuer of mortgage-backed securities guaranteed by GNMA ("GNMA securities"), while Defendant John C. York, Jr. was a 65% shareholder, as well as President and chief executive officer, of York Associates. John York was also at such times a 65% shareholder, as well as Chairman of the Board and chief executive officer, of Defendant First Commonwealth Savings Bank ("First Commonwealth") which, at all times relevant to the Complaint, was a Virginia savings bank.

Finally, Defendant USGI, Inc. ("USGI") is a corporation headquartered in Norwalk, Connecticut. At all relevant times, USGI was a mortgage banking institution that was an approved issuer of GNMA securities, but was not an affiliate of York Associates, John York, or First Commonwealth.

### B. The Quail Run Transaction

#### 1) York Associates' Agency Relationship with Ginnie Mae

DRG Funding Corporation ("DRG") was a mortgage banking institution (unrelated to the Defendants and Counterdefendant) that issued GNMA securities backed by mortgage loans insured by HUD and coinsured by DRG. On September 16, 1988, DRG defaulted under its Guaranty Agreements and its mortgages and securities became the property and responsibility of GNMA.

GNMA requested York Associates, among other approved issuer-lenders, to bid for the award of a subservicing contract for the DRG portfolio. York Associates submitted a bid, received the award, and took over the responsibility for subservicing the portfolio on GNMA's behalf on September 22, 1988. On that date, GNMA entered into a Sub–Contract Servicing Agreement with York Associates "as [GNMA's] agent for these limited purposes to perform loan servicing, loan management and loan enforcement, work-out and liquidation services" with respect to the DRG loans insured by HUD and corresponding GNMA securities issued by DRG. Between 1988 and January 1991, York Associates was paid fees of $5,874,531.87 as Ginnie Mae's subservicing agent.

The Agreement transferred to York Associates custody of all DRG records regarding DRG's portfolio of HUD-insured mortgages and GNMA mortgage-backed securities, and the Agreement specified that York Associates received this "property and information for the purpose of performing its duties under this Agreement." The Agreement further stated that York Associates was

appointed as agent for GNMA and as special attorney-in-fact for GNMA in that certain Sub–Contract Servicing Agreement dated September 22, 1988 between GNMA and York [Associates], and pursuant thereto, York is authorized to act under a cer-

---

7. Summary judgment shall be rendered upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Frito-*

*Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C.Cir.1988). The Government and the York Parties filed a lengthy Joint Statement of Facts Not in Dispute [hereinafter "Jt. Stmt."], to which Defendant USGI, Inc. joined. From the Court's perspective, all the essential facts are undisputed, though the parties sharply disagree on the proper legal interpretation of the underlying facts. Accordingly, the case is susceptible to summary judgment.

tain special power of attorney for GNMA, in its name, place and stead, on behalf of and for the use and benefit of GNMA with respect to such mortgage loans and all matters related thereto.

Senior officers of York Associates met with representatives of Ginnie Mae on a weekly basis to discuss any issues that arose concerning the Subservicing Agreement. It is important to note that at these meetings, GNMA did not offer and the York Parties did not seek any advice or guidance concerning purchase by York Associates of a security that York Associates serviced for GNMA, and neither did the York Parties inform GNMA that they had made such a purchase.

Included in the DRG portfolio was a coinsured loan to the owners of a property located in Casper, Wyoming, known as Quail Run Apartments. The loan was financed by issuing a GNMA security. The Quail Run loan went into default and DRG acquired title to the property after a foreclosure sale. The foreclosure sale was advertised in the Casper, Wyoming *Star Tribune,* and a subsequent auction sale of the project by DRG was advertised in *The Wall Street Journal.*

### 2) The York–USGI Arrangement

In October of 1988, John York and his partner, Michael I. Lipson, attended a meeting they arranged with the Chief Operating Officer and Executive Vice President of USGI. At the meeting, the participants explored an arrangement between the York entities and USGI to seek opportunities to acquire from security holders GNMA securities that had the potential for early prepayment, which would result in a redemption at a price higher than the prevailing market price for the security. One element of the arrangement was that the securities that USGI would seek to purchase would be securities serviced by York Associates, and that USGI would gain information about whether the security was likely to prepay from information that York Associates had provided to USGI. For profits on the redemption of these securities, there would be a splitting of

profits of 75 percent to York Associates and 25 percent to USGI.

Thereafter, on December 16, 1988, Lipson provided USGI with York Associates' security activity log. On January 13, 1989, USGI transmitted to Lipson "summary sheets" that synthesized the data that Lipson had provided USGI. The summary sheets identified whether or not each loan was in default as well as other details, such as the current recordholder of securities issued by York Associates.

On January 17, 1989, USGI sent Lipson a summary list that enumerated over 60 loans identified as issued by DRG and their loan repayment status as reported by York Associates, and asked Lipson to update the attached lists.

### 3) The Quail Run Security Purchase and Redemption

Shortly after the October 1988 meeting between York and USGI, USGI contacted John York regarding the current status of the Quail Run security, and learned that the loan had been foreclosed and the property sold, and that a claim for insurance benefits would be filed, such that the security was likely to prepay. York Associates obtained the information from the data on the DRG funding portfolio it had received from GNMA pursuant to the Sub–Contract Servicing Agreement.

Thereafter, on December 9, 1988, USGI purchased the Quail Run security from Salomon Brothers.[8] On the same day, USGI sold it to First Commonwealth, a York affiliate. On January 20, 1989, York Associates, as subservicer for GNMA on the DRG portfolio, filed a claim for coinsurance on the Quail Run mortgage on Ginnie Mae's behalf. In October 1989, the Government disbursed the insurance proceeds to York Associates.

Prior to redemption, First Commonwealth, by John York, agreed to sell the Quail Run security back to USGI (at a higher price), and the redemption payment was made to USGI. First Commonwealth and USGI

---

**8.** Salomon Brothers is a large New York investment firm and was a major participant in trading in GNMA securities backed by coinsured multi-

family loans. Salomon Brothers helped create, and maintained, a market in GNMA securities.

shared the redemption profits of 75 percent/25 percent, respectively.[9]

## C. *The Forest Isle Transaction* [10]

In 1985, York Associates refinanced the loan of a Canadian investor in the Forest Isle Apartments, as a coinsuring lender, and it issued a GNMA security in the face amount of the new loan. In November 1986, the Canadian investor informed York Associates that he could not continue to meet his monthly loan payments and would default on the loan. The Forest Isle project went through a refinancing in February and March of 1987.

York Associates took a deed in lieu of a foreclosure from the Canadian investor. York Associates then sold legal title to a partnership. A "Nominee and Indemnity Agreement," dated as of March 31, 1987, stated that York Associates sold "bare, nominal, legal title" to the property to a partnership solely "in the capacity of agent, nominee and trustee for the sole use and benefit of [York] Associates." York Associates "indemnifie[d] and agree[d] to defend and hold harmless" the partners from any and all claims or expenses "as a result of, on account of, in connection with, or related to" their involvement in the property. York Associates further agreed to fund all cash contributions required of the partnership. Under the Nominee and Indemnity Agreement, York and Lipson personally agreed to guarantee all obligations of York Associates. On the same date as the Nominee and Indemnity Agreement, York Associates also provided a 12.5 million coinsured loan to the partnership and issued GNMA securities backed by such loan.

Late in 1987, Robert Keating—York Associates' contact at Salomon Brothers and, at that time, a close friend of John York and a director of First Commonwealth—telephoned John York and made an unsolicited offer to sell various securities in Salomon's inventory, included among which was a portion of the Forest Isle GNMA security. John York bought the Forest Isle security on behalf of First Commonwealth from Solomon Brothers because he felt it was going to prepay, and that he would therefore realize the benefit from the purchase price and par value.

In addition, John York concluded that Forest Isle could not generate sufficient revenue to sustain its debt servicing agreements and that the mortgage would have to default. John York therefore determined to discontinue further advances by York Associates for operating deficits of the project, resulting in a default under the loan.

On February 11, 1988, Salomon Brothers sold all of the Forest Isle security but a $500,000 share—which it did not yet own—to First Commonwealth, the York affiliate, at 93.568% of par. Approximately one week later, York Associates signed a contract for an auction sale of the Forest Isle property.

---

**9.** The Government represents that the difference between the price at which USGI first purchased the security and its redemption price was $508,770.86, resulting in a profit to York and USGI of $381,578.14 and $127,192.72, respectively. Plaintiffs' Motion at 6, and citations therein. The York Parties submit that the correct difference between the purchase price and the redemption price is $455,620.00, but do not believe that this discrepancy is material for purposes of the instant Motions. Jt. Stmt. at 45. Thus, the only remaining dispute is over $53,150.86.

**10.** The Government raised the Forest Isle transaction in an affirmative defense in its Answer in Civil Action No. 91–3094 which alleged, *inter alia*, a breach of contract based on insider trading. In connection with that defense, the Government sought the denial of all relief to York Associates. Without citing any authority, the Defendants now argue that the Government cannot raise Forest Isle in its instant Motion, as it seeks therein a set-off based on a breach of fiduciary duty theory as an alternative to a denial of all relief.

There is no allegation, however, that the Defendants were not placed on notice by the Government's Answer in Civil Action No. 91–3094 that Forest Isle was an issue in the relief phase of that case. Moreover, the Defendants have fully addressed and defended their actions in connection with Forest Isle in the dispositive pleadings now before the Court. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed.R.Civ.P. 15(b). The Court thus finds no merit to the Defendants' suggestion that the Forest Isle transaction is not properly before the Court. In any event, the Federal Rules of Civil Procedure afford liberal amendments of the pleadings if necessary, even after judgment. *Id.* The Court sees no necessity for such action in this case, however.

Salomon Brothers obtained the remaining portion of the Forest Isle security from a religious organization that then owned it, in order to sell it to York. On March 9, 1988, Salomon Brothers bought the remaining portion of the security and, on the same date, sold it to First Commonwealth. The religious organization did not know at the time it sold the security that the underlying mortgage was in default.

In April 1988, York Associates filed a claim for coinsurance benefits on the Forest Isle mortgage with the Government. In October 1988, HUD paid the benefits to York Associates, which resulted in redemption of the securities then held by First Commonwealth. In turn, First Commonwealth collected $765,681.00 more in redemption proceeds than it paid for the security.

### DISCUSSION

### I. THE COURT FINDS THAT YORK ASSOCIATES VIOLATED ITS FIDUCIARY DUTY OWED TO GINNIE MAE WHEN IT PURCHASED QUAIL RUN, A SECURITY YORK ASSOCIATES SERVICED FOR THE GOVERNMENT

Analysis of both the Quail Run and Forest Isle transactions involves invocation of basic legal concepts concerning the fiduciary duty an agent of the United States owes its principal. As a preliminary matter, while the parties disagree as to whether an agency relationship was involved in the Forest Isle transaction, they concur that, with respect to the Quail Run transaction, the Sub–Contract Servicing Agreement governing York Associates' subservicing of the DRG portfolio on GNMA's behalf contained express language creating an agency relationship. In particular, York Associates entered into the Agreement on September 22, 1988 "as [GNMA's] agent for these limited purposes to perform loan servicing, loan management and loan enforcement, work-out and liquidation services" with respect to the DRG loans insured by HUD and corresponding GNMA securities issued by DRG. The Agreement further appointed York Associates "as agent for GNMA and as special attorney-in-fact for GNMA," authorizing it "to act under a certain special power of attorney for GNMA, in its name, place and stead, on behalf of and for the use and benefit of GNMA with respect to such mortgage loans and all matters related thereto."

The foregoing conceded, the instant dispute centers upon whether York Associates breached its fiduciary duty to GNMA under the Sub–Contract Servicing Agreement in connection with Quail Run, and whether the remaining Defendants induced such a breach. The Government identifies three separate conflicts of interest which it claims constituted violations of York Associates' fiduciary duty to GNMA. First, the Government contends that, in acquiring a security for which GNMA soon would be required to pay them, York Associates assumed a financial interest in direct conflict with that of GNMA, its principal. Second, the Government asserts that York Associates breached its fiduciary duty to GNMA by trading information obtained from GNMA in exchange for a share (kept by its affiliate First Commonwealth) of the profits garnered by that information. And third, the Government argues that York Associates created a conflict by using GNMA's information to usurp former Quail Run security holders' profit on the redemption.

In contrast, the Defendants contend that, because GNMA concededly suffered no loss as a result of the Quail Run transaction, York Associates breached no express duty under the Sub–Contract Servicing Agreement, and York Associates breached no implicit duty of its relationship with GNMA because the material information disclosed to USGI—*i.e.,* that the Quail Run mortgage had been foreclosed and the property sold—was not "confidential" but, instead, public and readily available to an interested party such as USGI, Salomon Brothers, or from other sources. Moreover, as discussed fully in Section I.C., *infra,* the Defendants assert that, even if there were a breach, the remedy sought by the Government is unwarranted.

### A. In Purchasing the Quail Run Security, York Associates Acquired an Interest in Conflict With the Interests of the United States

Notwithstanding the Government's identification of three conflicts of interest in its

briefs, counsel for both the Government and the York Parties focused at oral argument primarily on one aspect of the Quail Run transaction which the Court finds particularly troubling: York Associates' purchase and redemption of a security it serviced for GNMA. From the Court's perspective, at bottom, the three "conflicts" the Government discusses collapse into one, as underlying York Associates' purchase and redemption of the Quail Run security was the use of information it obtained from GNMA as its agent under the Sub–Contract Servicing Agreement, information to which the prior security holders and other potential investors did not have such easy access. Accordingly, upon careful consideration of the applicable law and the entire record herein, the Court finds that York Associates breached its fiduciary duty owed to Ginnie Mae in purchasing and redeeming for a profit the Quail Run security it serviced for GNMA.

The relevant law is also not subject to serious dispute. Though over eighty years old, *United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910), remains the seminal case prohibiting government agents from obtaining a profit by acquiring an interest in conflict with the interests of the United States. The defendant in *Carter* was a United States Army captain who entered into a corrupt arrangement with contractors for harbor improvements, whereby he utilized contract information to ensure the contractors untoward profits in which he, in turn, shared. The Supreme Court affirmed that the defendant's relations with the contractors "were inconsistent with his fidelity to the United States, and that he must account to his principal for every dollar or gain or profit or advantage which has been derived by him from these contracts." *Id.* at 309, 30 S.Ct. at 521.

The Court's lengthy reasoning, quoted throughout subsequent jurisprudence, also bears repeating here:

> The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with is fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

*Id.* at 305, 30 S.Ct. at 519. Notably, the Court further held it "immaterial ... whether the complainant was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any loss by fraud or otherwise." *Id.* *Accord United States v. Kearns*, 595 F.2d 729, 734 (D.C.Cir. 1978).

Cases following *Carter* have further held that the existence of an "apparent"—versus an "actual"—conflict of interest is sufficient to constitute a violation of a government agent's fiduciary duty. That is, the Government need not prove actual damage if it merely shows that the agents' "performance of public duties might well have been infected by a conflict of loyalties." *Kearns*, 595 F.2d at 734. *See also United States v. Kenealy*, 646 F.2d 699, 704 (1st Cir.) (in finding breach of fiduciary duty by appraiser for the Federal Housing Administration, court found immaterial the defendant's actual involvement in particular real estate transactions so long as record established an apparent conflict of interest between the defendant's official duties and his outside activities), *cert. denied*, 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981); *Robertson v. Chapman*, 152 U.S. 673, 682, 14 S.Ct. 741, 744, 38 L.Ed. 592 (1894) ("The law will not permit [an agent], without the knowledge or assent of his principal, to occupy a position in which he will be tempted not to do the best he may for the principal."). "It is true," however, "that conflict of interest must be undisclosed to constitute a breach of duty to the principal." *Kearns*, 595 F.2d at 734.

Here, the relevant facts demonstrating a violation of York Associates' fiduciary duty to the United States are undisputed. The York Defendants concededly entered into an "arrangement"[11] with USGI whereby

---

11. The Defendants acknowledge that York Asso-

ciates and USGI "explored an arrangement" to

York Associates would provide USGI with information it acquired as Ginnie Mae's agent regarding securities that were likely to prepay in exchange for a 75 percent share in the redemption proceeds. Although the York Parties dispute whether this arrangement was ever executed, the facts underlying the Quail Run transaction are undisputed and, as John York's deposition testimony confirms,[12] they are consistent with the so-called arrangement York Associates discussed with USGI. Moreover, as a condition precedent to a finding of breach of fiduciary duty under the law, the Court observes that the conflict created by the purchase and redemption of the Quail Run security was not disclosed to Ginnie Mae. Accordingly, the Court cannot but find that this transaction squarely smacks of an abuse of York Associates' agency relationship with the United States, in violation of the decades-old mandate of *Carter.*

The chronology of undisputed facts supporting the Court's finding that York Associates breached its fiduciary duty to Ginnie Mae warrant repeating: it is undisputed that the Sub–Contract Servicing Agreement between Ginnie Mae and York Associates provided that York Associates received information regarding the Quail Run security "for the purpose of performing its duties under th[e] Agreement," and no other; that USGI obtained information regarding the precise default status of the mortgage underlying the Quail Run security from York Associates, who had been provided such information by Ginnie Mae in its capacity as GNMA's subservicing agent;[13] that on the basis of this information, USGI purchased the Quail Run security and sold it to First Commonwealth, an affiliate of York Associates who, in turn, sold it back to USGI; that prior to the redemption of the security, York Associates (as subservicer for GNMA on the DRG portfolio) filed a claim for coinsurance on the Quail Run mortgage on Ginnie Mae's behalf and received the insurance proceeds, thereby triggering a redemption; that USGI later redeemed the security from Ginnie Mae and split the redemption profits with York Associates' affiliate, 25/75 percent, respectively;

seek out and purchase Ginnie Mae securities likely to default, but take issue as to whether an "agreement" was ever reached. Response of York Parties to Government Parties' Supplemental Brief at 5. As the critical facts are undisputed, the Court finds the semantical distinction raised by the Defendants wholly irrelevant. Indeed, while John York referred in his deposition to "a business arrangement," Michael Lipson, John York's partner, instead called the "business arrangement" a "business relationship," whereby First Commonwealth and USGI would "seek opportunities to acquire Ginnie Maes that had the potential for early prepayment." York SEC dep. (Plaintiffs' Exh. 15) at 261; Lipson dep. (Plaintiffs' Exh. 14) at 102. Whether an "arrangement," a "relationship" or an "agreement" was struck (and whether these terms carry significant legal distinctions—the York Parties do not identify any), the subsequent undisputed conduct by the York Parties convinces the Court that a breach of fiduciary duty occurred.

**12.** In response to the question of whether the agreement between York Associates and USGI ever was consummated, John York testified, "I believe on Quail Run." 1994 York dep. (Plaintiffs' Exh. 7) at 128. *See also* Lipson dep. (Plaintiffs' Exh. 14) (in response to the same question, Lipson testifies, "[t]o the extent the Quail Run opportunity came, yes").

**13.** It is worth noting that the York Parties further concede that on December 16, 1988, following the October 1998 arrangement between York Associates and USGI, Michael Lipson (John York's partner) provided USGI with York Associates' security activity log from which USGI, in turn, created "summary sheets" identifying whether or not each loan was in default as well as other details, such as the current recordholder of securities issued by York Associates. It is also undisputed that on January 17, 1989, USGI sent Lipson a summary list that enumerated over 60 loans identified as issued by DRG and their loan repayment status as reported by York Associates, and asked Lipson to update the lists.

Although the Court need not look beyond York Associates' purchase and redemption of the Quail Run security (underlying which was its trading of information regarding the default status of the Quail Run security in exchange for a 75 percent share of the redemption proceeds) to find a breach of fiduciary duty, the Court cannot ignore the potential conflict created by York Associates' divulging of other information in apparent execution of its "arrangement" with USGI. Indeed, the Court finds specious the York Parties' implication that it is perfectly acceptable for a Ginnie Mae subservicer to pass information it obtained solely as a subservicer to a particular entity in exchange for profits on that entity's redemption of securities subserviced by the subservicer. Such an arrangement flies in the face of the trust and confidence bestowed on a government agent to act in the best interests of its principal, the United States.

and that during the period of these transactions, York Associates served as GNMA's agent for purposes of administering the Quail Run security, but failed either to inform Ginnie Mae of its involvement in the purchase and redemption of the security or to seek Ginnie Mae's advice or guidance regarding the propriety of the same in view of its express agency relationship with GNMA.

Thus, in sum, the York Parties engaged in a conflict of interest in purchasing—based on information it obtained as GNMA's agent—a security for which Ginnie Mae would imminently have to redeem at a higher price, thereby ensuring themselves a substantial profit from the United States, York Associates' principal. This situation clearly falls within the bounds of *Carter, supra,* in which a government agent in charge of a public improvement utilized his position to ensure himself a financial interest in the untoward profits private contractors received in the execution of their government contracts.

■ Furthermore, the Court finds irrelevant the much-made-of fact that news of the foreclosure and auction sales of the Quail Run project was publicly available to investors through examination of certain newspapers or otherwise. While the York Parties argue that this fact belies the Government's claim that York Associates engaged in a conflict of interest in trading information obtained from Ginnie Mae as its subservicing

agent, neither *Carter* nor its progeny contain any caveat that a cognizable conflict of interest involve disclosure of purely confidential information. Indeed, while the *Carter* Court flatly refused to require the showing of any "specific abuse of discretion" by an agent before the government may recover for a breach of fiduciary duty, *Carter,* 217 U.S. at 305, 30 S.Ct. at 519, later courts have condemned activity creating a mere *potential* that an agent's duties to the United States could be affected by a conflict in loyalties. *See United States v. Kearns,* 595 F.2d 729, 734 (D.C.Cir.1978). As the undisputed facts demonstrate, the York Parties plainly crossed that boundary in connection with the Quail Run transaction.[14] At the very least, York Associates was in a position to control the timing by which the insurance claim on the defaulted Quail Run loan was filed (which triggered the redemption), and exercised this control only after its co-Defendants' purchase of the security was executed (using information York Associates obtained as Ginnie Mae's agent), thus ensuring its own profit on the redemption. Moreover, in collaboration with a particular investor, York Associates used its superior access to information regarding the default status of Quail Run and other securities it serviced to garner a profit for itself. These bare facts reveal a conflict of interest in violation of York Associates' fiduciary duty under any measure of the *Carter* Court's language and reasoning.[15]

14. For the same reason, the Court is wholly unpersuaded by the York Parties' argument that because John York "merely said 'yes' to offers from a highly sophisticated and powerful market participant," *i.e.,* Salomon Brothers, their purchase of the Quail Run security did not violate any fiduciary duty owed Ginnie Mae under the Sub-Contract Servicing Agreement. Response of York Parties to Government Parties' Supplemental Brief at 16.

In addition, with respect to both the Forest Isle and Quail Run transactions, the Court takes this opportunity to observe that, consistent with the Defendants' briefs, counsel for the York Parties at oral argument spent considerable time emphasizing that Salomon Brothers is a powerful and sophisticated market player who has not challenged York Associates' conduct, even though the York Parties purchased the Forest Isle and Quail Run securities from Salomon Brothers prior to redemption. It further appeared to the Court that counsel was implying through its repeated reference to Salomon Brothers at oral argument

that if Salomon Brothers (the "biggest in the business") considered his clients' conduct acceptable in the marketplace, any less sophisticated entity should naturally also find the conduct acceptable. The Court fails to see, however, how Salomon Brothers' role in any transaction at issue is relevant in any meaningful way to the Court's findings.

In any event, the Court further observes that it is undisputed that Defendant USGI's own internal policy was not to disclose to third parties default information for mortgages underlying securities it serviced without the permission of the security holder because, according to its executive vice-president, a third party "could be thought of as picking off the owner of the security." Jt. Stmt. at ¶ 50.

15. The Court further finds, absent serious argument to the contrary, that Defendants John York, First Commonwealth and USGI are jointly and severally liable for inducing York Associates' breach of fiduciary duty. Under the relevant

**B. A Subservicer's Purchase and Redemption of Securities it Services for Ginnie Mae Frustrates the Statutory Purpose of the GNMA Mortgage–Backed Securities Program, Which is to Fund Low– and Middle–Income Housing**

▮ As previously mentioned, the Government contends that the York Parties created a separate conflict of interest by using Ginnie Mae's information to usurp the former Quail Run security holder's profit on the redemption. Notwithstanding the independent merit of the Government's argument, the Court wishes to emphasize this aspect of the Quail Run transaction for another reason, namely, to highlight the Supreme Court's admonition that *"[t]he larger interests of public justice will not tolerate, under any circumstances,* that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with its fidelity as an agent." *United States v. Carter,* 217 U.S. 286, 305, 30 S.Ct. 515, 519, 54 L.Ed. 769 (1910) (emphasis added). *Cf. United States v. Barber,* 668 F.2d 778, 784 (4th Cir.1981) (noting, on appeal of a mail fraud conviction, the public's "strong interest in upstanding conduct in the affairs of a state enterprise"), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). It is because the Ginnie Mae program was designed to stimulate private investment in the low- to middle-housing market that, in the interests of "public justice," the York Parties' exploitation for its own profit of information obtained as GNMA's agent cannot be tolerated. *See generally GNMA Investment Facts,* HUD–1047–GNMA (July 1992) (Plaintiffs' Exh. 2).[16]

At oral argument, counsel for the Government identified the harm stemming from York Associates' breach of its fiduciary duty as the loss of the public's trust in a level playing field in the securities market. In other words, the Government contends that, if entities enlisted by GNMA to help administer the market can utilize their superior access to information to "cherry pick" those securities that are sure to be redeemed at a profit, others will be discouraged from investing in the market. Because the market is intended to raise funds for residential housing, the harm the Government identifies is a serious one.

While, as set forth above, it is immaterial to finding a breach of fiduciary duty whether the Government can show "any actual loss by fraud or otherwise" (a principle which the York Parties overlook in arguing repeatedly that GNMA suffered no direct financial loss as a result of the Quail Run transaction), the Court is nonetheless deeply troubled by the

law, co-defendants "can be held liable if they are shown to be active participants in [the agent's] breach of his duty." *United States v. Kenealy,* 646 F.2d 699, 705 (1st Cir.), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981). *See also Continental Management, Inc. v. United States,* 527 F.2d 613, 616 (Ct.Cl.1975) ("It is well-established ... that a third party's inducement of or knowing participation in a breach of duty by an agent is a wrong against the principal which may subject the third party to liability."). Based on the foregoing discussion of the undisputed facts in this case, it is highly evident that Defendants John York, First Commonwealth and USGI each knowingly and actively participated in the purchase and redemption of the Quail Run security, the conduct which the Court finds constituted a breach of York Associates' fiduciary duty to Ginnie Mae.

In any event, the Court observes that the liability of said Defendants for inducing a breach of fiduciary duty was afforded relatively cursory treatment in the voluminous pleadings filed by all parties in this case. Indeed, the Defendants themselves did not proffer pointed argument under the aforementioned legal standards (or any

others, for that matter) to the effect that they did not actively participate in the Quail Run transaction.

**16.** The brochure, *GNMA Investment Facts,* is a primer for investors considering the purchase of GNMA securities. It reads, in pertinent part, as follows:

GNMA's mission is to support the Government's housing objectives. It does this by establishing secondary markets for residential mortgages, making mortgage investments attractive to all types of investors. Through its mortgage-backed securities programs, GNMA creates a vehicle for channeling funds from the securities markets into the mortgage market and helps to increase the supply of credit available for housing.

. . . . .

GNMA securities represent home financing for many Americans who might be unable to obtain other acceptable financing and realize the dream of homeownership.

*GNMA Investment Facts,* HUD–1047–GNMA (July 1992) (Plaintiffs' Exh. 2) at 1.

conflict between the York Parties' activity and Ginnie Mae's statutory mandate. *United States v. Kearns*, 595 F.2d 729, 734 (D.C.Cir.1978). *See also Continental Management, Inc. v. United States*, 527 F.2d 613, 619 (Ct.Cl.1975). The York Parties purchased the Quail Run security from the existing security holder based on knowledge that it had defaulted and would prepay at a premium, knowledge readily available to York Associates by virtue of its role as Ginnie Mae's agent. This knowledge was not nearly as accessible to other investors who might, in turn, avoid investing in Ginnie Mae securities if GNMA agents were allowed to profit from their superior access to information regarding such securities. Although the Court acknowledges that, based on the record alone, this harm to the market is speculative,[17] such a result would surely frustrate the purpose of the mortgage-backed securities program, which is to *stimulate* investment in the housing industry.[18]

## C. The Proper Remedy for York Associates' Breach of its Fiduciary Duty to Ginnie Mae in Connection with the Quail Run Transaction is Disgorgement of the Profits it Obtained in Said Transaction and Forfeiture of the Agency Fees that GNMA Paid York Associates as Subservicer

As relief for the York Parties' breach of its fiduciary duty in connection with Quail Run, the Government seeks disgorgement of profits earned by York Associates on the Quail Run securities transaction, as well as forfeiture of the $5,874,531.87 in fees paid York Associates under the Sub–Contract Servicing Agreement it had with GNMA. The Defendants, on the other hand, assert that there is no supportable basis for requiring First Commonwealth to disgorge its profit on the Quail Run transaction to anyone and that, even if there were a breach, there is no allegation or evidence that it affected the

---

**17.** In any event, the Court need not find tangible harm to hold that York Associates breached its fiduciary duty to GNMA in connection with Quail Run. *See United States v. Drumm*, 329 F.2d 109, 113 (1st Cir.1964) (absence of evidence that federal poultry inspector passed bad poultry or that the reputation of the government's inspection program was damaged by the defendant's conduct would not bar recovery by the government upon finding of a breach of fiduciary duty). It is enough that an apparent (if not actual) conflict of interest threatened the larger interests of public justice, as was surely the case here.

**18.** The Court does observe, however, that the *amicus* put forth persuasive arguments in its brief and at oral argument suggesting that such harm to the market would follow in the event the York Parties' activities challenged in this case (in connection with both Quail Run and Forest Isle) were condoned. *See supra* note 1.

In particular, *amicus* PTC represents in its brief *amicus curiae* that it holds record title to about 97 percent of all mortgage-backed securities guaranteed by GNMA. According to counsel for PTC, PTC does not turn a profit on these securities but, rather, operates as a "book entry system" to record ownership of the securities and move them out of active trading. Tr. of April 19, 1995 hearing at 42–43. PTC further asserts that the mortgage-backed securities market is very diverse, and that security holders are injured when Ginnie Mae issuers and subservicers purchase securities that they issued or service, especially when, as in this case, they know that redemption of the securities by Ginnie Mae is imminent. PTC believes that many issuers and

subservicers are aware that this conduct is proscribed by GNMA practice, as "the role of the issuer and the subservicer is perceived as somewhat unique[, as t]hey are the custodian of the mortgages and the servicers of the mortgages, and for this reason it is commonly assumed that they wouldn't be trading in the secondary market." *Id.* at 43. PTC thus submits that Court action is necessary in this case to enforce GNMA's policies protecting security holders.

The Court further observes that the facts underlying the Forest Isle transaction demonstrate that security holders would be harmed if Ginnie Mae's agents were allowed to engage in such activity. As explained further *supra*, Forest Isle involved essentially the same unlawful transaction as did Quail Run: York Associates purchased and redeemed a security which, in the case of Forest Isle, it issued and serviced for GNMA. It is undisputed that a portion of the security was purchased from a parochial organization which, unlike York Associates, did not know at the time that the Forest Isle security would imminently be redeemed by Ginnie Mae. Its salesman testified that, if it had, it "absolutely" would not have sold the security. Moran dep. (Plaintiffs' Exh. 23) at 40. *See also* Woodby dep. (Plaintiffs' Exh. 25) at 57. Although Salomon Brothers purchased the security from the parochial organization (and not the York Parties, though York Associates purchased it from Salomon Brothers on the very same date), these facts strongly suggest that harm to the market would occur if issuers and servicers of Ginnie Mae securities were allowed to purchase and redeem the securities they issue or service.

performance of York Associates' duties under the Sub–Contract Servicing Agreement so as to justify forfeiture by York Associates of its contractual compensation therefor.

■ *Carter* makes clear that an agent who breaches its fiduciary duty "must account to his principal for every dollar or gain or profit or advantage which has been derived by him" in connection with the unlawful activity. *United States v. Carter*, 217 U.S. 286, 309, 30 S.Ct. 515, 521, 54 L.Ed. 769 (1910). *See also United States v. Podell*, 572 F.2d 31, 34 (2d Cir.1978) (holding that "public officials and employees serving interests in conflict with those of the United States for their own gain hold the funds they receive, no matter what the source, in constructive trust for the government"). Accordingly, the Court finds that, at a minimum, the Defendants must disgorge the profits they obtained in purchasing and redeeming the Quail Run security, in violation of the fiduciary duty York Associates owed to Ginnie Mae.[19] Indeed, the Defendants to not dispute that this is a proper remedy in the event the Court finds a breach of fiduciary duty.

■ The Government further argues, however, that simply awarding the United States the profits gained by the Defendants is insufficient to deter government agents from engaging in such activity in the future. Thus, the Government seeks forfeiture of all fees received by York Associates under the Sub–Contract Servicing Agreement.

The Court shall grant the Government's request. In light of the Defendants' calculated scheme to use information obtained by York Associates as Ginnie Mae's agent to target and purchase securities likely to be redeemed at a premium, the Court finds that disgorgement of the profits obtained on Quail Run is not a sufficient remedy to "provide a means of enforcing the loyalty of [the government's] agents." *United States v. Kearns*, 595 F.2d 729, 734 (D.C.Cir.1978). Indeed, the Court is mindful of the "larger interests of public justice" implicated when a government agent violates its fidelity to the United States. *Carter*, 217 U.S. at 306, 30

S.Ct. at 520. As the Court of Appeals for the District of Columbia Circuit explained,

> The purpose of the civil remedy is not to restore particular funds to the Government, but to provide a means of enforcing the loyalty of its agents. The action pursued here is a proper tool, based on common law notions of principal-agent relations, for controlling the possible loss of impartial public administration.

*Kearns*, 595 F.2d at 734. *See also United States v. Eilberg*, 507 F.Supp. 267 (E.D.Pa. 1980). Any lighter measure would leave future entities free to hedge their bets and engage in such unlawful conduct at the mere risk of losing the profits gained through their breaches of fiduciary duty. It would also leave York Associates in no worse position that it would have occupied had it respected the agency relationship it held with the United States, a result which would not comport with the interests of justice.

Moreover, in the Court's view, ordering forfeiture of all subservicing fees is also consistent with the weight of authority. In *Woods v. City Nat. Bank & Trust Co. of Chicago*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), the Supreme Court held that "[w]here a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted." *Id.* at 268, 61 S.Ct. at 497.

The York Parties argue that the alleged misconduct involved a discrete transaction and did nothing to affect York Associates' performance of its other duties under the Sub–Contract Servicing Agreement. However, the *Woods* Court flatly rejected this argument:

> A fiduciary ... may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict

---

**19.** As previously noted, the parties dispute the correct dollar figure reflecting the profits gained on Quail Run. *See supra* note 9. The Court

shall therefore direct each side to submit a Declaration in support of their views of the correct amount of said profits.

adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.'

*Id.* at 269, 61 S.Ct. at 497. *See also Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994) (where bankruptcy court finds that counsel for debtor engaged in an impermissible conflict of interest, available sanctions include the denial or disgorgement of all fees received); *Condren v. Grace,* 783 F.Supp. 178, 185 (S.D.N.Y.1992) (breach of attorney's fiduciary duties to his client sanctions denial of legal compensation); *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210, 1218 (1974) (agent who breaches its fiduciary duty relinquishes the right to compensation for its services in addition to any profits obtained).

The law is also clear that where an agent's "conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." Restatement (Second) of Agency § 469 (1958).[20] Accordingly, in *Wilshire Oil Co. of Texas v. Riffe,* 406 F.2d 1061 (10th Cir.), *cert. denied,* 396 U.S. 843, 90 S.Ct. 105, 24 L.Ed.2d 92 (1969), the Tenth Circuit denied a corporate officer any compensation for his services during the period of his breach of loyalty to the corporation, even though the division for which he was responsible was profitable during that period.

Applying this rule to the instant case, the Court finds that York Associates shall be required to disgorge its fees as Ginnie Mae's subservicing agent for the period from its entry into its agreement with USGI to share GNMA information in exchange for any profits on redemption of securities it serviced up to the termination of its agency relationship with Ginnie Mae. As the parties apparently do not dispute the amount of fees paid, the Court shall award the Government $5,874,-531.87, reflecting the total fees York Associates received under the Sub–Contract Servicing Agreement.

## II. THE COURT FINDS THAT YORK ASSOCIATES' PURCHASE OF THE FOREST ISLE SECURITY CREATED A CONFLICT OF INTEREST IN VIOLATION OF ITS FIDUCIARY DUTY OWED TO GNMA AS AN APPROVED ISSUER OF GINNIE MAE MORTGAGE–BACKED SECURITIES

The Government claims that York Associates breached its fiduciary duty to Ginnie Mae in its transactions regarding yet another property, Forest Isle. Unlike with Quail Run, however, the Sub–Contract Servicing Agreement did not govern York Associates' dealings with Forest Isle. Rather, York Associates issued and serviced the Forest Isle security as a Ginnie Mae-approved issuer. Ultimately, as with Quail Run, York Associates purchased and redeemed the Forest Isle security at a profit. Accordingly, the Government again contends that in so doing York Associates breached its fiduciary duty to Ginnie Mae. And again, the Court agrees.

### A. Issuers are Agents of GNMA for Purposes of Administering GNMA–Guaranteed Mortgage–Backed Securities

■ As an initial matter, the Government asserts that GNMA issuers are agents of Ginnie Mae for purposes of administering Ginnie Mae-guaranteed mortgage-backed securities and that, as such, York Associates owed a fiduciary duty to Ginnie Mae. Notwithstanding the York Parties' arguments to the contrary, the Court agrees with the Government.

First, the York Parties proffer no reason why the Court should not defer to Ginnie Mae's administrative determination on this issue, contained in a letter of sanction which the Government refers to as *The Matter of Bogley, Harting, Mahoney & Lebling, Inc.* (Plaintiffs' Exh. 5). In *Bogley,* GNMA determined that an issuer had breached its fidu-

---

20. Comment (a) following this provision explains further:

An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to compensation which otherwise would be due him.... This is true even though the conduct of the agent does not harm the principal, and even though the agent believes that ... he is justified in so acting.

ciary duty by soliciting—but not actually buying—a security where the underlying mortgage, which the issuer serviced, was in default. While the York Parties attempt to distinguish *Bogley* by pointing to the lack of evidence that the Defendants in this case solicited the Forest Isle security, the Court finds that the administrative decision, dated February 9, 1976, plainly condemns as a fiduciary violation an issuer's purchasing and redeeming for profit a security it issued, as occurred here. The text of the determination bears repeating, in pertinent part:

> [T]he presumption ... that you [the issuer] intended to purchase the securities at a discount and realize a profit upon collection of the insurance proceeds to the detriment of the securities holders whose interests depended on the integrity of your corporation in the administration of the issue ... appears to constitute an abuse of your corporation's fiduciary position.

*The Matter of Bogley, Harting, Mahoney & Lebling, Inc.* (Plaintiffs' Exh. 5) at 2. As the same reasoning applies to the instant case, the Court shall defer to this GNMA determination which, according to the record, Ginnie Mae has not since contradicted. *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Commission*, 898 F.2d 801, 804 (D.C.Cir. 1990) ("agencies enjoy broad discretion in interpreting statutes entrusted to their administration so long as their construction is permissible").

■ In any event, the Court further finds that the traditional attributes of an agency relationship are present in the relationship issuers of Ginnie Mae mortgage-backed securities share with their principal, GNMA. According to the Court of Appeals for this Circuit, an agent-principal relationship contains two essential characteristics. *Johnson v. Bechtel Associates Professional Corp.*, 717 F.2d 574, 579 (D.C.Cir.1983), *rev'd on other grounds*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). First, the principal must indicate its right to control the agent's conduct regarding matters entrusted to it. And second, the agent must manifest its consent to act on behalf of the principal. *Id.* Finally, other courts have included a third element in finding an agency relationship, to wit, the agent's power to alter the legal relations between the principal and third parties. *See, e.g., Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 219 (6th Cir.1992), and citations therein. *See also* Restatement (Second) of Agency § 12. The Court finds that all three elements are present as between GNMA and an issuer such as York Associates.

■ As to the first element, the record reveals that Ginnie Mae exercises substantial control over the conduct of issuers. GNMA publishes extensive mortgage-backed security program rules which contain lengthy approval conditions and restrictions with which issuers must comply, including a standard of professional and ethical conduct, securities marketing and trading requirements, and net worth requirements, and the rules afford Ginnie Mae broad latitude to terminate approved issuers. *See generally Government National Mortgage Association Mortgage-Backed Securities Guide*, Handbook GNMA 5500.1 Rev. 6 (May 1993) (Plaintiffs' Exh. 1), Chapters 2, 6 [hereinafter *Ginnie Mae Guide*].[21] In addition, GNMA controls issuers' conduct by allowing them only bare legal title in the mortgages underlying the securities and establishing a beneficial interest in the mortgages in the security holders. *Id.*, App. 24 (Guaranty Agreement) at §§ 3.01, 4.14. Ginnie Mae further requires

---

21. In their briefs, the Plaintiffs carefully review the *Ginnie Mae Guide* to highlight many components of GNMA's control over issuers' conduct, which the Court need not repeat here. While the York Parties acknowledge "the extensive issuer approval and securities administration provisions referenced in plaintiffs' memorandum," they argue—without citing a shred of authority—that said provisions are more typical of a licensor-licensee relationship, "which the issuer-GNMA relationship more closely approximates." Opposition to Plaintiffs' Motion for Summary Judgment at 10. In light of the two-part test for an agency relationship enunciated by the Court of Appeals for the District of Columbia Circuit in *Johnson*, the Court cannot agree. The provisions set forth in the *Ginnie Mae Guide* and elsewhere indicating GNMA's ongoing control over issuers amply satisfies the first prong of that test.

that issuers establish a segregated custodial account into which they must direct all payments on the mortgages, and forbids issuers from withdrawing these funds except for payments to the security holders. *Id.* at §§ 4.14, 7.03; 24 C.F.R. § 390.9(b). In view of the foregoing, there is no question that GNMA establishes control over issuers of mortgage-backed securities.

The second element is also clearly met here. Prospective issuers must apply to become approved issuers of Ginnie Mae-guaranteed securities, *id.*, Chapter 6, App. 1, and issuers agree in their "Application for Approval As a Mortgage–Backed Securities Issuer" "to issue and administer Ginnie Mae mortgage-backed securities and service pooled mortgages in accordance with section 306(g) of the National Housing Act, its applicable regulations, and the applicable "[Ginnie Mae] Mortgage–Backed Securities Guide." *Id.*, App. 2 at § F. Accordingly, the Court finds that issuers manifest consent to act subject to GNMA's control, the contours of which are set forth in 12 U.S.C. § 1721(g), Title 24 of the Code of Federal Regulations, and the *Ginnie Mae Guide.*

Finally, the Court observes that issuers have the power to bind Ginnie Mae, a conclusion which the York Parties do not dispute. Simply put, in selling securities to private investors, issuers bind GNMA to its guaranty of payment. Indeed, "[t]he full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under [a] guaranty." *Id.*, App. 42 (Mortgage–Backed Certificate Guaranteed by Government National Mortgage Association) at 3.

Accordingly, the Court finds that the traditional indicia of an agency relationship are present as between GNMA and its issuers such that York Associates owed a fiduciary duty to Ginnie Mae as an issuer of GNMA-guaranteed mortgage-backed securities, which included Forest Isle.

**B. York Associates Breached its Fiduciary Duty to GNMA When, Having it Caused a Default on the Forest Isle Loan, it Purchased and Redeemed the Forest Isle Security**

▇ As with the Quail Run transaction, the Government claims that York Associates created three separate conflicts of interest in its dealings over the Forest Isle property, each of which constituted a breach of fiduciary duty owed to Ginnie Mae. In particular, the Government contends that, first, by purchasing a security guaranteed by its principal, GNMA, York Associates acquired a financial interest in conflict with GNMA, and did so without revealing to GNMA its ownership of the security or its control of the entity that defaulted on the loan. Second, the Government argues that by usurping the former security holders' recovery of the premium from redemption of the security, the York Parties' conduct conflicted with GNMA's interest in encouraging private investment in the mortgage backed securities market, and thus in the residential housing industry. Third, the Government asserts that, under principles of equity, a trustee is barred from purchasing the trust property, here, the mortgage backed security certificate which confers on the holder a right to pass-throughs of all payments and prepayments on the underlying mortgage.[22]

**22.** In view of its finding that York Associates breached its fiduciary duty in purchasing and redeeming the Quail Run security, the Court need not and shall not address the sub-issues raised by the Government's contention that a trust relationship was involved and violated in connection with Forest Isle. *But see New York Guardian Mortgagee Corp. v. Cleland,* 473 F.Supp. 422, 427–29 (S.D.N.Y.1979) (likening relationship between GNMA, its issuer and its security holder to that of a trust).

The Court cannot but mention, however, that the undisputed facts underlying this third argument are striking, to say the least. In 1985, York Associates extended a HUD-insured loan to the

owner of the Forest Isle Apartments who, in 1986, informed York Associates that he would default on the loan. Thereafter, York Associates decided to restructure the loan by, first, taking a deed in lieu of foreclosure from the owner. Second, York Associates created a "straw-man" partnership to take title and operate the property, *i.e.,* York Associates transferred only "bare, nominal, legal, record" title to the partnership, funded all cash contributions of the partnership, and agreed to "indemnify and hold harmless" the partnership from any expenses associated with the property. Third, York Associates made a new HUD-insured loan to the "partnership," enabling Associates to issue a new Ginnie Mae-

In contrast, the York Parties again argue that no fiduciary duty was breached in connection with Forest Isle and that, even if there were a breach, the Government is not entitled to the remedy it seeks as a result thereof. In particular, as further explained in Part III, *infra*, the York Parties assert that the "unclean hands" defense is inapplicable to the claims asserted in Civil Action No. 91–3094.

As with Quail Run, the Court finds that the three "conflicts" identified by the Government in connection with Forest Isle are effectively enveloped into one: York Associates breached its fiduciary duty to GNMA in purchasing (through First Commonwealth) the Forest Isle security and, in turn, obtaining a corresponding premium upon its redemption by GNMA. This conflict is exacerbated by the undisputed fact that York Associates itself caused a default on the mortgage loan, an act which led to the inevitable redemption of the Forest Isle security at a profit York Associates ultimately enjoyed. York Associates thus possessed and exercised the unique power to await causing a default until it had purchased the Forest Isle security.[23] No other former or potential security holder had access to such power.

Also as with Quail Run, the relevant facts are undisputed. In particular, it is undisputed that the Forest Isle security was issued by York Associates and guaranteed by Ginnie Mae; that York Associates, as Ginnie Mae's issuer (and as lender and effective borrower and owner of the property collateralizing the loan), had access to loan default information superior to that of the average security holder and, in fact, made the determination to cause a default under the loan; that York Associates' affiliate, First Commonwealth, purchased the security from the former security holders because John York felt it was going to prepay, such that he would realize the benefit from the purchase price and par value; that York Associates filed a claim for coinsurance benefits on the Forest Isle mortgage with Ginnie Mae, thereby triggering redemption of the securities; and that, thereafter, First Commonwealth redeemed the Forest Isle security at a profit of $795,861.00. It is further undisputed that neither York Associates nor First Commonwealth informed Ginnie Mae that York Associates was paying redemption proceeds to its own affiliate, and that, during the period of these transactions, York Associates was a Ginnie Mae issuer that had issued and serviced the Forest Isle security.

Based on the same authorities and reasoning underlying the Court's finding that York Associates breached its fiduciary duty to Ginnie Mae in purchasing and redeeming the Quail Run security, the Court finds that York Associates' purchase and redemption of the Forest Isle security created a conflict of interest in violation of its fiduciary duty owed GNMA as an issuer of Ginnie Mae securities.

The Court observes that, as set forth above, Forest Isle was raised in connection with the "unclean hands" defense the Government raised in Civil Action No. 91–3094, an earlier case in which York Associates sought mortgage insurance benefits from HUD in connection with twenty coinsurance loans made by York Associates on which borrower defaults occurred. The Court found for York Associates on the question of statutory construction, but declined to grant any relief, leaving the remaining issues— including those implicating Forest Isle—for resolution in the instant case, Civil Action No. 93–839. *York Associates, Inc. v. Secre-*

---

guaranteed security in order to raise private investment to fund the loan. Consequently, at the end this arrangement, York Associates controlled all aspects of Forest Isle: it was, effectively, the lender and borrower, issuer and servicer, and the owner of the property collateralizing the loan.

As discussed more fully in the text, York Associates, as owner, later defaulted on the loan, but only after purchasing (through First Commonwealth) the Forest Isle security from the existing security holders. When the security was redeemed, York Associates' affiliate realized a prof-

it of $795,681.00, in violation of York Associates' fiduciary duty to Ginnie Mae as an issuer.

**23.** Indeed, the York Parties concede, as they must, that "York's ownership of the Forest Isle project while it was also the mortgage lender did give it the capacity to choose the moment of default (as project owner), triggering co-insurance payments to itself (as mortgage lender)." York Parties' Supplemental Memorandum at 22 n. 22.

*tary of Housing and Urban Development*, 820 F.Supp. 14, 20 (D.D.C.1993).

Accordingly, in view of the procedural posture in which the Forest Isle matter was raised, the question before the Court next becomes whether York Associates' breach of fiduciary duty in connection with Forest Isle (and, according to the Government, in connection with Quail Run) constitutes "unclean hands" warranting denial of all relief in Civil Action No. 91–3094. It is to this issue which the Court now turns.

### III. *YORK ASSOCIATES' UNCLEAN HANDS WARRANT A COMPLETE DENIAL OF ANY MONETARY RELIEF IN CIVIL ACTION NO. 91–3094*

The Government implores the Court to utilize its equitable powers under the Administrative Procedure Act [24] to deny all monetary relief to York Associates in Civil Action No. 91–3094, arguing that York Associates comes to this Court with "unclean hands" in its dealings concerning Quail Run and Forest Isle. As an alternative to denial of all relief, the Government seeks an offset of $795,-681.00 against the damages the Court might otherwise award in Civil Action No. 91–3094.

In opposition, the York Parties argue that the improper conduct identified by the Government as grounds for precluding recovery of damages in the prior suit is not sufficiently connected to York Associates' claim in Civil

Action No. 91–3094 to permit application of the unclean hands defense.[25] For the reasons discussed below, the Court finds that the unclean hands defense does apply to warrant denial of all relief in that case.

The Government claims that the York Parties acted improperly toward the Ginnie Mae in at least three ways, thereby warranting the denial of any monetary relief in Civil Action No. 91–3094. The Court shall focus on two of them, the first and most obvious of which is York Associates' violation of its fiduciary duty to Ginnie Mae in the two transactions at issue in this case.[26]

Secondly, the Government asserts that York Associates breached the Sub–Contract Servicing Agreement by turning over to USGI extensive information that it had received from GNMA concerning DRG's portfolio, including loan payment status, the identities of security holders, and data regarding over 60 loans, in order to gain profits from redemptions of securities likely to prepay. The Agreement contains an express provision that York Associates received such information from GNMA "for the purpose of performing its duties under this Agreement." The fact that York Associates disclosed such information notwithstanding the language of the Agreement is also undisputed.

■ "The guiding doctrine ... is the equitable maxim that 'he who comes into equity

---

**24.** 5 U.S.C. §§ 551 *et seq.* (1988).

**25.** Without citing any authority, the York Parties further contend that, while the unclean hands doctrine is relevant only to equitable relief, it is unclear whether York Associates is seeking equitable or legal relief in the prior suit. The Court finds no merit to this argument. The Supreme Court has made clear that a party's claim for funds to which a statute allegedly entitles it is generally "an equitable action for specific relief" and not "an action at law for damages." *Bowen v. Massachusetts*, 487 U.S. 879, 893–95, 108 S.Ct. 2722, 2731–32, 101 L.Ed.2d 749 (1988). *See also Hubbard v. Administrator, EPA*, 982 F.2d 531, 533–37 (D.C.Cir.1992) (en banc). York Associates' claim in Civil Action No. 91–3094 plainly falls within this rule—as the Court necessarily acknowledged in declining to grant relief in that case pending consideration of the Government's affirmative defense (sounding in equity) and counterclaim, and the claims raised in Civil Action No. 93–839.

**26.** The Government's third contention is that the York Parties concealed their involvement in the redemption of the Quail Run and Forest Isle securities. On this issue, it is undisputed that York Associates' principals failed to ask about the propriety of purchasing the Quail Run security during their regular consultations with Ginnie Mae officials and that, without GNMA's knowledge, York Associates engaged in the purchase and sale-back transaction of the Quail Run security with USGI just prior to its redemption. Moreover, with respect to Forest Isle, the parties do not dispute that York Associates took no steps to inform GNMA at the time GNMA approved issuance of the Forest Isle security that York Associates had made the loan underlying the security to itself.

The Court shall not independently address this third contention as, in the Court's view, it underlies the first, namely, York Associates' breach of fiduciary duty in connection with the Quail Run and Forest Isle transactions.

must come with clean hands.'" *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). This is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* Although the maxim applies "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation," courts of equity "are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933). Notably, the doctrine "assumes even wider and more significant proportions" when the suit in equity concerns the public interest as well as the litigants' private interests. *Precision Instrument Mfg. Co.*, 324 U.S. at 815, 65 S.Ct. at 997.

▇ As a preliminary matter, the Court finds that the unclean hands doctrine plainly applies to bar recovery of additional insurance proceeds on the Forest Isle mortgage. "What is material is not that the plaintiff's hands are dirty, but that ... the manner of dirtying renders inequitable the assertion of such rights against the defendant." *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir.1963). With respect to Forest Isle, the York Parties used their superior knowledge and control over the Forest Isle loan to ensure themselves a tidy profit in the purchase and redemption of the Forest Isle security. In turn, York Associates now stands before the Court in Civil Action No. 91–3094 seeking further insurance

proceeds from the United States on that same loan, where it had filed the claim for coinsurance on the loan only after purchasing the Forest Isle security, thereby ensuring themselves a premium on the redemption.[27] In light of this breach of fiduciary duty, the Court finds that York Associates cannot as a matter of equity recover the further sums it seeks as additional insurance proceeds on the Forest Isle loan.

▇ The question remains, however, whether York Associates' improper conduct warrants denial of all relief sought in Civil Action No. 91–3094, as opposed to a mere offset of the profits gleaned from the purchase and redemption of the Forest Isle security. The Government argues that York Associates' improper disclosure to USGI of data regarding 60 DRG loans (as part of an "arrangement" to usurp valuable securities prior to redemption) is directly related to its prayer in Civil Action No. 91–3094 that the Court award additional insurance proceeds on a number of those same loans.[28] The York Parties argue, on the other hand, that there is no direct relationship between the equity York Associates seeks in Civil Action No. 91–3094 and the conduct challenged by the Government in this case.

In the exercise of its equitable discretion, the Court finds that there is a sufficient nexus between York Associates' conduct in connection with Forest Isle, Quail Run, and 60 other DRG loans to warrant denial of all relief in Civil Action No. 91–3094. As set forth above, under *Keystone Driller Co.* and like cases, "[t]he wrong which may be involved to defeat the suit must have an immediate and necessary relation to the equity which the complainant seeks to enforce against the defendant." *NLRB v. Fickett–Brown Mfg. Co.*, 140 F.2d 883, 884 (5th Cir.

27. John York himself admitted in his deposition that he "bought [the Forest Isle security] because I felt it was going to prepay; that I would realize the benefit between the purchase price and par value." York SEC dep. (Plaintiffs' Exh. 15) at 230.

28. In Civil Action No. 91–3094, York Associates seeks additional insurance proceeds from HUD and Ginnie Mae on a total of twenty loans. The Court notes that the Government is inconsistent

in its papers as to whether York Associates disclosed information as to ten of those loans (Plaintiffs' Supplemental Brief at 20) or as to twelve of those loans (Plaintiffs' Response to York Parties Supplemental Memorandum at 11). This minor discrepancy is irrelevant for purposes of this Memorandum Opinion, however, in view of the Court's finding that the York Parties engaged in a conflict of interest with Ginnie Mae and breached their fiduciary obligation as set forth herein.

1944). *See also Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980); *Pierce v. Apple Valley, Inc.,* 597 F.Supp. 1480, 1485 (S.D.Ohio 1984). The Court finds such a relation here, bearing in mind the Supreme Court's emphasis in *Keystone Driller Co.* that courts of equity are not limited by formula in their just discretion to apply the doctrine. *Keystone Driller Co.,* 290 U.S. at 245–46, 54 S.Ct. at 147–48.

In light of the broad discretion afforded courts of equity under *Keystone Driller Co.,* the Court declines to hold—as the York Parties apparently would have it—that it may only invoke the unclean hands doctrine if the improper conduct were precisely related to the calculation of insurance proceeds on the twenty loans involved in Civil Action No. 91–3094. The equitable doctrine is not so restrictive. Rather, the rule "den[ies] relief if the granting of the relief asked will, because of the complained of activities of the litigant, produce an illegal or unjust result." *Fickett–Brown Mfg. Co.,* 140 F.2d at 884. Here, the York Parties' conduct was antithetical to the very purpose of the Ginnie Mae mortgage-backed securities program, and the Court shall not use its equitable discretion to award York Associates additional insurance proceeds on loans the majority of which the York Parties' impropriety implicated. This is particularly so given the fact that, prior to filing Civil Action No. 91–3094, York Associates already received full insurance payments from HUD on the defaulted loans, and now merely seeks further interest on those payments, which they had received in cash. *See generally York Associates, Inc. v. Secretary of Housing and Urban Development,* 820 F.Supp. 14, 16 (D.D.C.1993).

In any event, the Court finds that the misconduct identified by the Government has a sufficient nexus to the relief sought by York Associates for the unclean hands doctrine to apply. York Associates' disclosure of loan servicing information in apparent furtherance of a scheme to locate and usurp redemption premiums is directly related to its attempt to maximize its insurance recoveries on those very same loans, one of which

was Forest Isle. Moreover, while York Associates ultimately seeks further relief in the prior action by virtue of its status as a coinsuring lender and issuer (and thus an agent) of Ginnie Mae, it is this same agency relationship which York Associates violated in its dealings with Forest Isle and, under the Sub–Contract Servicing Agreement governing a number of the loans for which it now seeks further relief, in its dealings with Quail Run. Denying recovery of additional insurance benefits on these loans is not "punishment for extraneous transgressions, but instead is based upon 'considerations that make for the advancement of right and justice.'" *Republic Molding Corp.,* 319 F.2d at 349 (quoting *Keystone Driller Co.,* 290 U.S. at 245, 54 S.Ct. at 147)).

Furthermore, it is of no import that York Associates did not disclose servicing information for all the loans involved in Civil Action No. 91–3094 or, for that matter, succeed in purchasing and redeeming each corresponding security at a premium. In *Keystone Driller Co.,* the Supreme Court upheld the district court's application of the unclean hands doctrine to nullify five patents where the plaintiff's improper conduct (inducing an individual who knew about a defect in one of the patents to conceal his knowledge) involved only one of the five patents. *Keystone Driller Co.,* 290 U.S. at 245–46, 54 S.Ct. at 147–48. As the Ninth Circuit later explained, a court applying the unclean hands doctrine "must weigh the substance of the right asserted by the plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account and an equitable balance struck." *Republic Molding Corp.,* 319 F.2d at 347.

In the instant case, that balance is squarely struck in favor of the Government, particularly as a suit implicating the doctrine "assumes even wider and more significant proportions" where, as here, it involves the public interest. *Precision Instrument Mfg. Co.,* 324 U.S. at 815, 65 S.Ct. at 997. Accordingly, the Court finds that York Associates shall not recover any further relief in Civil Action No. 91–3094 in light of its breach of fiduciary

duty and other improper conduct towards Ginnie Mae.

### CONCLUSION

For the foregoing reasons, the Court finds in this case (Civil Action No. 93–839) that the Government's Motion for Summary Judgment shall be granted, and the Defendants' Motions for Summary Judgment Dismissing the Counterclaim in Civil Action No. 91–3094 and the instant Complaint, for Summary Judgment Dismissing the Government's Defenses, and for Further Relief Pursuant to the Court's prior Declaratory Judgment shall be denied. The Court shall issue an Order of even date herewith consistent with this Opinion.

Judgment at this time shall be entered in favor of the Government in the amount of $5,874,531.87, a sum reflecting the fees York Associates received under the Sub–Contract Servicing Agreement it had with Ginnie Mae. The Court shall further direct each side to submit to the Court a Declaration in support of their respective views of the correct calculation of the profits the York Parties unlawfully obtained in their purchase and redemption of the Quail Run security, and the Court shall thereafter make a determination as to the proper amount and enter an amended Judgment therefor, plus costs.

### ORDER

For the reasons set forth in the Court's Memorandum Opinion of even date herewith, it is, by the Court, this 30 day of May, 1995,

ORDERED that the Plaintiffs' Motion for Summary Judgment shall be, and hereby is, GRANTED, as hereinafter provided; and it is

FURTHER ORDERED that Counterdefendant York Associates' Motions for (1) Summary Judgment Dismissing Counterclaim and Complaint, (2) Summary Judgment Dismissing Defenses, and (3) Further Relief Pursuant to Declaratory Judgment shall be, and hereby are, DENIED; and it is

FURTHER ORDERED that Judgment shall be, and hereby is, ENTERED in favor of the Plaintiffs and against Counterdefendant York Associates, Defendant John C. York, Defendant First Commonwealth Savings Bank, and Defendant USGI, Inc., jointly and severally, in the amount of $5,874,531.87, representing the fees paid York Associates under the Sub–Contract Servicing Agreement; and it is

FURTHER ORDERED that, in view of the dispute between the parties as to the amount of profits obtained by the York Parties on the Quail Run transaction, *i.e.*, the difference between the price at which USGI first purchased the Quail Run security and the price at which it was redeemed (the Plaintiffs represent that the proper amount is $508,770.86 while the York Parties represent that the proper amount is $455,620.00), each side shall submit to the Court a Declaration in support of their position on or before 4:00 p.m. on June 16, 1995 and, thereafter, the Court shall make a determination based on said Declarations as to the proper amount of profits obtained on the Quail Run transaction and enter an amended Judgment therefor in favor of the Plaintiffs, plus costs, in addition to the sum specified in the above-Ordered paragraph herein; and it is

FURTHER ORDERED that any and all Motions or pleadings herein shall be, and hereby are, rendered and declared MOOT, and the case shall stand dismissed, without prejudice, from the dockets of this Court. However, each side may submit the aforementioned Declarations on or before 4:00 p.m. on June 16, 1995, for a determination of profits obtained on the Quail Run transaction and entry of an amended Judgment.

### MEMORANDUM OPINION OF CHARLES R. RICHEY UNITED STATES DISTRICT JUDGE ON MOTIONS

July 18, 1995

### INTRODUCTION

Before the Court are three post-judgment Motions: (1) the York Parties' Motion for Clarification or, in the alternative, to Stay Execution of Judgment; (2) the York Parties' Motion to Alter or Amend Judgment or, in the alternative, for Reconsideration; and (3)

Motion of Defendant USGI, Inc. to Alter or Amend the Judgment.

On July 11, 1995, the Court held a hearing on these Motions and all other outstanding issues in this case. At that time, counsel for the York Parties and counsel for the Government represented that they have reached an agreement regarding the posting of a supersedeas bond by Defendants John C. York and First Commonwealth Savings Bank FSB pending the disposition of the instant Motions and any and all appeals in this case. The Court has since received an Unopposed Motion for Approval of Bond and Entry of Stay and, simultaneously herewith, has approved the bond submitted by Defendants John C. York and First Commonwealth and has entered a stipulated Order granting a stay of any execution of the judgment against said Defendants.

Also at that time, counsel for the York Parties represented that Defendant York Associates would not be posting any bond, and counsel for Defendant USGI, Inc. has since filed a pleading, advising the Court that they are still working with Government counsel in an effort to reach a mutually agreeable resolution of the bond issue. Defendant USGI Inc.'s Response to the Plaintiff's Cross–Motion for Supersedeas Bond, at 2. In view of the foregoing, the Court shall declare moot the York Parties' Motion for Clarification or, in the alternative, to Stay Execution of Judgment.

In addition, counsel for the Government, counsel for the York Parties and counsel for Defendant USGI, Inc. advised the Court at the hearing that they have stipulated that the amount of profits obtained on the Quail Run transaction was $510,773.81. Thus, in accordance with the Court's Order of May 30, 1995, the Court shall enter an amended judgment for that amount, plus costs, in favor of the Government.

### DISCUSSION

In their Motion to Alter or Amend Judgment or, in the alternative, for Reconsideration, the York Parties challenge the Court's order of forfeiture of the full $5,874,531.87 in fees paid to York Associates under the Sub–Contract Servicing Agreement. *See* Memo-

randum Opinion and Order entered May 30, 1995. They contend principally that, because the fees under the Agreement were paid per month and per loan, it was legal error to order the forfeiture of fees paid for properly performed services. The Court finds no merit to the York Parties' Motion.

▪▪▪ As an initial matter, the Court observes that the York Parties have completely failed to meet—or even address in their initial Motion—the standards applicable to motions for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure. "A motion for reconsideration is discretionary" and "[t]he primary reason for reconsideration of judgment are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *National Trust v. Dep't of State*, 834 F.Supp. 453, 455 (D.D.C.1993) (quoting *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992)), *aff'd in part and rev'd in part on other grounds*, 49 F.3d 750 (D.C.Cir. 1995). In a subsequent pleading filed at the Court's behest, the York Parties assert that their Rule 59(e) Motion is proper in order to correct a clear error or prevent manifest injustice. The York Parties conveniently ignore the principle, however, that "[a] Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled." *State of New York v. United States*, 880 F.Supp. 37, 38 (D.D.C.1995) (per curiam); *see also National Trust*, 834 F.Supp. at 455. "Only if the moving party presents new facts or a clear error of law which 'compel' a change in the court's ruling will the motion to reconsider be granted." *State of New York*, 880 F.Supp. at 38. Here, the York Parties do nothing but regurgitate arguments made throughout the voluminous pleadings carefully considered and rejected by the Court in reaching its exhaustive May 30, 1995 decision. On this basis alone, the York Parties' instant Motion must be denied.

Moreover, the Court finds that the York Parties are flatly incorrect in asserting that

the law clearly precludes the Court from awarding the Government the fees received under the Sub–Contract Servicing Agreement. While the York Parties attempt once again to distinguish the cases relied upon by this Court, the Court sees no reason whatsoever to disturb its decision or alter its reasoning. *See* Memorandum Opinion at 31–34. Moreover, the York Parties' interpretation of certain Restatement sections in their instant pleadings does nothing to undermine the Court's reliance on Supreme Court and Circuit authority.

The Court takes this opportunity to observe further that an action for breach of fiduciary duty is traditionally equitable in nature and, as such, the award of damages is measured by the "length of the Chancellor's foot." *See In re Evangelist,* 760 F.2d 27, 29 (1st Cir.1985) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'. . . ."). In the instant case, the Court found that merely requiring disgorgement of the profits would be insufficient to dissuade other government agents from engaging in the unlawful conduct that occurred here, and "[o]nly strict adherence to . . . equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.'" *Woods v. City Nat. Bank & Trust Co.,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941).

As the Court stated at the July 11, 1995 hearing, there are two standards in America today that cause the American people to mistrust their Government. One is what one might call the public need and the other might be characterized as private greed. While there is plainly a public need for facilitating the building of multi-family housing for poor and middle-income people through the GNMA program, it was not and could not have been the mandate of Congress to allow GNMA agents to elevate their private greed above their fiduciary obligation to the taxpayers of the United States. The public need is superior to any private interest which in this case is tantamount to private greed. The Court thus found that disgorgement of the profits obtained on Quail Run alone was not and is not a sufficient remedy "to provide

a means of enforcing the loyalty of [the government's] agents." *United States v. Kearns,* 595 F.2d 729, 734 (D.C.Cir.1978).

The York Parties also reiterate other arguments previously raised and rejected by this Court. Again, the Court sees no reason to alter or amend its judgment on any of these bases. In particular, the Court finds entirely without merit the York Parties' semantical argument that the Court improperly found on summary judgment that there was a "scheme" to acquire GNMA securities that had a potential for prepayment. The Court reached its conclusions in reliance upon the *stipulated* facts that there was just such an "arrangement" amongst the York Parties and Defendant USGI, Inc. For the York Parties now to complain that the "arrangement" was not a scheme or breach of fiduciary duty when the result is patently clear through their stipulated facts is utter folly. This is not a game for attorneys or a matter that needs any post hoc rationalization. The Court wrote fifty-one pages of analysis based on the facts submitted jointly by the parties, all of which are well-documented. The Court therefore finds without merit the York Parties' claim that summary judgment was somehow improper here. *See* Memorandum Opinion at 21 n. 11.

As for Defendant USGI's Motion to Alter or Amend the Judgment, the Court observes that USGI had every opportunity to raise the instant arguments on summary judgment, but did not proffer *any* serious argument under the relevant law to rebut the Government's contention that USGI was jointly and severally liable *in any way* for inducing York Associates' breach of fiduciary duty. *Id.* at 26 n. 15. For this reason alone, the Court could deny the instant Motion. *See Natural Resources Defense Council v. United States Environmental Protection Agency,* 705 F.Supp. 698, 701 (D.D.C.), *vacated on other grounds,* 707 F.Supp. 3 (D.D.C.1989) ("Rule 59(e) motions are not vehicles for bringing before the court theories or arguments that were not advanced earlier.").

■ In any event, the Court cannot accept USGI's contention that it cannot be held jointly and severally liable for the forfeited

subservicing fees.[1] The forfeited fees are simply a measure of damages,[2] and the agent—as well as the party who induced the agent's breach—must pay the piper the full price of the harm claimed. York Associates' breach of fiduciary duty to its principal, the United States, was obviously to the detriment of taxpayers because it inured to the Defendants' pecuniary private benefit while potentially jeopardizing funding for low- to middle-income housing development. This never could have been the intent of Congress.

In sum, the Court observes that it is astounded at the parties' post-judgment Motions following the May 30, 1995 wake-up call. Indeed, it appears to the Court that the York Parties and Defendant USGI, Inc. are simply engaged in a redundant afterthought. At the same time, however, this should not be unexpected for those caught red-handed in this scheme at the expense of the American people.

### JUDGMENT

The Order and Judgment entered herein on May 30, 1995, shall be amended as follows in accordance with the Court's Memorandum Opinion issued of even date herewith as well as the Memorandum Opinion issued on May 30, 1995.

It is, by the Court, this 17th day of July, 1995,

ORDERED that an amended Judgment in the total amount of $6,385,305.68, plus costs, shall be, and hereby is, ENTERED in favor of the Plaintiffs and against Counterdefendant York Associates, Defendant John C. York, Defendant First Commonwealth Savings Bank, and Defendant USGI, Inc., jointly and severally; this figure represents the stipulated amount of profits obtained on the Quail Run transaction as well as the fees received by Defendant York Associates under the Sub–Contract Servicing Agreement; and it is

FURTHER ORDERED that the York Parties' Motion for Clarification or, in the alternative, to Stay Execution of Judgment shall be, and hereby is, declared MOOT; and it is

FURTHER ORDERED that the York Parties' Motion to Alter or Amend Judgment or, in the alternative, for Reconsideration shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Motion of Defendant USGI, Inc. to Alter or Amend the Judgment shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that, in view of the denial of the Motion of Defendant USGI, Inc. to Alter or Amend the Judgment and the entry of a final judgment on this date, Defendant USGI, Inc. shall have until 4:00 p.m. on July 24, 1995 in which to comply with Rules 7 and 8 of the Federal Rules of Appellate Procedure and present to the Court a bond sufficient to satisfy the requirements of law; and it is

FURTHER ORDERED that, in view of the fact that the Court has, simultaneously

---

1. Although the York Parties and USGI complain that the Government did not request that the Court find them jointly and severally liable for the subservicing fees, they concede that the Government's Complaint included a prayer for relief for joint and several liability on the subservicing fees. *See* Supplemental Brief of the York Parties on the Application of Fed.R.Civ.P. 59(e), at 3. Accordingly, the Court finds no reason to disturb its judgment on that basis.

2. The Court finds no merit to USGI's argument that the Court committed an error of law by imposing a contract-based liability on USGI when USGI had no contract with the Government. The cases relied upon by the Court in ordering forfeiture of fees do not even discuss liability under a breach of contract theory. *See* Memorandum Opinion at 31–34. In any event, numerous cases have recognized that breach of fiduciary duty is an action sounding in tort. *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 595 (11th Cir.1995), *petition for cert. filed*, 63 U.S.L.W. 3892 (U.S. Jun. 9, 1995) (No. 94–2014); *Klein v. Grynberg*, 44 F.3d 1497, 1503 n. 3 (10th Cir.1995), *petition for cert. filed*, 63 U.S.L.W. 3849 (U.S. May 17, 1995) (No. 94–1898).

In turn, USGI's argument that the Court imposed an improper civil penalty on USGI is also misplaced. Rather, the Court found the York Parties and Defendant USGI jointly and severally liable for the entire damage award, which was measured by the amount of profits earned on the Quail Run transaction and the amount of fees paid under the Sub–Contract Servicing Agreement.

herewith, approved the bond submitted by Defendants John C. York and First Commonwealth and has entered a stipulated Order Granting Stay of Execution of Judgment against Defendants John C. York and First Commonwealth, the Unopposed Motion for Approval of Bond and Entry of Stay shall be, and hereby is, GRANTED per the Order Granting Stay of Execution of Judgment, filed of even date herewith.