Eduardo **BURKHART**, Appellee

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, Appellant.

No. 96–7163.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1997.

Decided May 16, 1997

Gerard J. Stief, Associate General Counsel, Washington Metropolitan Area Transit Authority, argued the cause for appellant, with

whom Robert L. Polk, General Counsel, Robert J. Kniaz, Deputy General Counsel, Washington, DC, David R. Keyser, Takoma Park, MD and Mark F. Sullivan, Thousand Oaks, CA, were on the briefs.

Marc Fiedler, Washington, DC, argued the cause and filed the brief for appellee.

Deval L. Patrick, Assistant Attorney General, United States Department of Justice, Jessica Dunsay Silver and Samuel R. Bagenstos, Attorneys, Washington, DC, were on the brief for the United States as amicus curiae.

Before EDWARDS, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Chief Judge EDWARDS.

SENTELLE, Circuit Judge:

Washington Metropolitan Area Transit Authority ("WMATA" or the "Authority") appeals from a judgment following a jury verdict finding WMATA (1) directly liable for negligent hiring, training, and supervision of its bus operators; (2) directly liable for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 *et seq.*; and (3) vicariously liable for assault, battery, and infliction of emotional distress. WMATA raises a myriad of issues on appeal, many of which have been waived and others of which are frivolous. We need only consider certain of the issues, finding them sufficient to reverse the judgment of the trial court as to the ADA and Rehabilitation Act claims and the negligent hiring, training, and supervision claims. However, we affirm the trial court's judgment as to the assault, battery, and infliction of emotional distress claims.

## I. Background

This case arises from a physical altercation that took place in northern Virginia between Eduardo Burkhart, plaintiff-appellee, and Archie Smith, a WMATA bus operator. On May 5, 1994, Burkhart and a friend, Basram Salman, both of whom are deaf, boarded a Metrobus in Arlington, Virginia. Burkhart and Salman each placed a thirty-cent token in the fare box. The correct fare for those with disabilities is fifty-cents. As the bus pulled away from the curb, Smith called both Burkhart and Salman back to pay the correct fare. However, because they are deaf, neither Salman nor Burkhart understood Smith's request. The events that followed this exchange are in substantial dispute. It is sufficient for our purposes to say that a series of blows was exchanged between Smith and Burkhart.

When the bus reached its destination at the Pentagon Metrorail Station, Burkhart exited the bus and began looking for a transit officer. At this point, the evidence is in dispute as to whether Burkhart was pointing to Smith or was sticking his finger in Smith's chest. In any event, Smith then grabbed Burkhart's finger. Burkhart responded by kicking Smith in the groin, causing him to release his hold of Burkhart's finger. Smith then picked up a stick, at which point he was restrained.

Ultimately, Transit Police Officer Jonathan Gray arrived on the scene. Officer Gray and Burkhart communicated by writing notes on a notepad. Burkhart testified that he requested an interpreter at some point during his exchange with Officer Gray. Officer Gray testified that no such request was ever made. An interpreter was not called to the scene. Upon completing his discussion with Officer Gray, Burkhart attempted to locate witnesses to the incident. Officer Gray then transported both Smith and Burkhart to a magistrate to press charges against one another. Both Smith and Burkhart were charged with assault and battery. However, these charges were ultimately dropped.

Burkhart subsequently filed suit against WMATA and Smith for injuries sustained as a result of the altercation with Smith. Burkhart asserted claims against Smith, and against WMATA vicariously, for assault, battery, gross negligence, and infliction of emotional distress. In addition, Burkhart alleged that WMATA negligently hired,

trained, and supervised its bus operators and, as a result, caused the assault and battery at issue. Still further, Burkhart alleged that he was subject to discrimination, by reason of his disability, in violation of both the ADA and Rehabilitation Act in that WMATA failed to take appropriate steps to ensure that communications with him were as effective as communications with others. The case was tried to a jury with a magistrate judge presiding. At trial, WMATA admitted that Smith was acting within the scope of his employment with WMATA when the events at issue occurred. As a result, the district court granted Smith's unopposed motion that the claims against him be dismissed.

During the course of the trial, Burkhart called Edward Spurlock as an expert "as to how the ADA [and] Rehabilitation Act impact on police practices, procedures, and training." WMATA objected to Spurlock as a witness, and a voir dire examination of the witness was conducted during which Spurlock recounted his expertise in police training and procedures. The court accepted Spurlock "as an expert with respect to the issues of police procedures, practices, and training, as they concern the [ADA] and the Rehabilitation Act." The trial judge then allowed Spurlock to testify concerning whether WMATA and Officer Gray had complied with the requirements of the ADA and Rehabilitation Act as well as accepted police procedures.

At the conclusion of trial, the jury returned a verdict for Burkhart. The jury concluded that WMATA was vicariously liable for assault and battery, and awarded Burkhart $373.65 in damages for medical expenses incurred. In addition, the jury found WMATA vicariously liable for infliction of emotional distress, and awarded Burkhart $510.00 for medical expenses. Further, the jury found WMATA directly liable for negligent hiring, training, and supervision, and awarded Burkhart $50,000 for "injuries caused by the defendants' acts." Finally, the jury found WMATA directly liable for violations of the ADA and Rehabilitation Act, and awarded Burkhart another $50,000 in damages for "injury, embarrassment, humiliation, frustration, inconvenience, indignity and/or the stigma of discrimination." As a result, the trial court entered a judgment for Burkhart in the amount of $100,883.65 and awarded him attorneys' fees and costs of $62,071.46 on the ADA claim. WMATA appeals raising thirteen separate issues of which three warrant discussion.

## II. Analysis

### A. Expert Witness.

#### 1. Error.

WMATA argues that the trial court erred in permitting Spurlock to testify as an expert concerning the ADA and Rehabilitation Act. Before considering whether Spurlock's testimony was proper expert witness testimony, we think it profitable to discuss briefly the requirements of the ADA.

The relevant provision of the ADA is Title II which governs "public entities," including agencies of state and local governments. 42 U.S.C. §§ 12131(1), 12132. Title II is divided into two parts. Part A generally prohibits disability-based discrimination by any public entity. *Id.* § 12132. Part B provides specific examples of prohibited discriminatory conduct in the public transportation context. *Id.* §§ 12142, 12143(a), 12144, 12146, 12147, 12148, 12162 (defining "discrimination for purposes of section 12132"). Of course, public transportation providers are also subject to the general nondiscrimination mandate of Title II(A). *See id.* § 12131 (defining a "public entity" subject to section 12132 as including "any commuter authority").[1]

The Attorney General has authority to promulgate regulations implementing Title II(A)'s general rule of nondiscrimination, *id.* § 12134(a), while the Secretary of Transportation has authority to promulgate regulations implementing the transportation-specific provisions of Title II(B), *id.* §§ 12149,

---

1. On appeal, WMATA contends that Part A of Title II does not apply to public transportation providers subject to Part B. We decline to address this challenge as it was not properly preserved below.

12164.[2] Subpart E of the Attorney General's ADA regulations governs communication with the disabled by a public entity. That subpart provides, *inter alia,* that:

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
>
> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in and enjoy the benefits of, a service, program, or activity conducted by a public entity.
>
> (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160 (1996). The Secretary of Transportation's ADA regulations require that public transportation providers "ensure that personnel are trained to proficiency, as appropriate to their duties, so that they ... properly assist and treat individuals with disabilities who use the service in a respectful and courteous way." 49 C.F.R. § 37.173.

■■■ As detailed above, Burkhart alleged that WMATA violated the ADA and Rehabilitation Act by failing to ensure that communication with him was "as effective" as communication with others. Spurlock testified as an expert in support of these claims. WMATA contends that it was error for the district court to permit certain aspects of this testimony. To evaluate expert testimony, the Federal Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED.R.EVID. 702. Interpreting this provision, we apply a two-part test for determining the admissibility of expert testimony: the witness (1) must be qualified, and (2) must be capable of assisting the trier of fact. *Exum v. General Elec. Co.,* 819 F.2d 1158, 1163 (D.C.Cir.1987). We review a district court's decision concerning the admissibility of expert testimony only for abuse of discretion. *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C.Cir. 1993).

### a. Spurlock's Qualifications.

■■■ WMATA first objects to the magistrate judge's determination that Spurlock was qualified as an expert given that he had no prior work experience involving the ADA and Rehabilitation Act. While work experience is obviously one method by which an individual may acquire an expertise in a particular field, it "is only one among the five different ways to demonstrate an expert is qualified." *Exum,* 819 F.2d at 1163. A witness may be qualified as an expert based on "knowledge, skill, experience, training, or education" in the relevant field. FED.R.EVID. 702 (emphasis added).

Spurlock testified that he was a police officer with the Metropolitan Police Department for over twenty-four years. During that time he served as an instructor in police training and procedures. Prior to that Spurlock spent five years as an officer with the U.S. Capitol Police where he wrote policy and served as a trainer. Spurlock further testified that he had "taught police practice and procedures [his] entire career" and evaluated training programs for numerous cities. Still further, Spurlock testified that he had reviewed the training requirements under the ADA and Rehabilitation Act. While Spurlock conceded that he was not an expert on the ADA and Rehabilitation Act, he asserted that he was an expert "with respect ... to how the ADA [and] Rehabilitation Act impact on police practices, procedures, and training." The trial judge agreed and accepted Spurlock as "an expert with respect to the issues of police procedures, practices,

---

**2.** The Department of Justice, as *amicus* in this case, asserts that the Attorney General's "regulatory authority extends as far as the substantive provision it implements." United States Brief at

**11.** We need not determine whether this is so given that we find other error sufficient to warrant reversal.

and training, as they concern the [ADA] and the Rehabilitation Act."

In light of the foregoing testimony, we cannot find that the judge abused her discretion in so ruling. Spurlock's lack of work experience with the ADA and Rehabilitation Act "goes to the weight rather than admissibility of the evidence." *Baerman v. Reisinger,* 363 F.2d 309, 310 (D.C.Cir.1966).

### b. Spurlock's Testimony.

■ WMATA also objects to the trial court's determination that Spurlock's testimony would assist the jury, arguing that it was error to permit Spurlock to offer legal conclusions concerning whether WMATA had violated the ADA and Rehabilitation Act. FED.R.EVID. 704(a) provides that "otherwise admissible" opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." As a result, WMATA cannot successfully argue that Spurlock improperly testified as to an "ultimate issue." Rather, WMATA argues that Spurlock's testimony was not "otherwise admissible."

■ Whether expert opinion testimony is "otherwise admissible" depends, in part, on whether it will "assist the trier of fact" in either "understand[ing] the evidence or ... determin[ing] a fact in issue." *See* FED. R.EVID. 702. Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not "otherwise admissible." *See Torres v. County of Oakland,* 758 F.2d 147, 150 (6th Cir.1985) (holding that expert testimony couched in terms of a "legal conclusion" is "not helpful to the jury"); *see also Weston v. WMATA,* 78 F.3d 682, 684 n. 4 (D.C.Cir. 1996) (stating that "legal conclusions on domestic law ... are outside [an expert] witness' area of expertise").

Of course, the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright. MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6661, at 327 (Interim ed.1992); *see also* Comment, *The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?,* 42 U. MIAMI L.REV. 831, 864 n.210 (1988). The Sixth Circuit has concluded that "[t]he best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Torres,* 758 F.2d at 151. Applying this principle in a Title VII suit, the *Torres* court concluded that it was improper to permit an expert to testify as to whether the plaintiff "had been discriminated against because of her national origin." *Id.* As the court explained, the expert's actual testimony constituted a legal conclusion for two reasons: it tracked the language of the applicable statute, and the term "discrimination" has a specialized legal meaning that is more precise than the lay understanding of the term. *Id.* However, the court noted in dicta that it would have been permissible for the expert to testify as to whether "national origin 'motivated' the hiring decision." *Id.* Testimony phrased as such would "address the factual issue of ... intent without implicating any legal terminology." *Id.*

■ The Sixth Circuit's distinction between legal conclusions and factual opinions is consistent with the notes accompanying Rule 704 which explain that the rule does not permit "opinions which would merely tell the jury what result to reach" or which are "phrased in terms of inadequately explored legal criteria." FED.R.EVID. 704 advisory committee's note. For example, "the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." *Id.* Just as the advisory committee stated that an expert cannot testify as to whether an individual possessed the "capacity" to make a will, so the Sixth Circuit concluded that an expert cannot testify as to whether "discrimination" occurred for purposes of Title VII. Both terms have specialized legal meanings that are inherently beyond the area of a witness' expertise. *See Weston,* 78 F.3d at 684 n. 4. In other words, an expert may offer his opinion as to facts

that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.

In this case, the testimony of Burkhart's expert consisted of impermissible legal conclusions rather than permissible factual opinions. Concerning Officer Gray's communication with Burkhart, Spurlock testified that the means of communication employed by Officer Gray were not "as effective" as the means of communication with others. In addition, Spurlock testified that if a "person asked for a translator," the ADA required that they be given one "unless it would change the service provided" or cause "an extraordinary expense or administrative requirement." Still further, Spurlock testified that communication with the disabled must be "equal to that of a person who is not disabled."

We are troubled by this testimony in two respects. First, Spurlock grossly misstated the law as to what constitutes "as effective" communication with the disabled. Nothing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests unless it would alter the service provided or create an unreasonable burden or expense. The regulation to which Spurlock was apparently referring provides only that the type of aid or service an individual requests should be given "primary consideration." 28 C.F.R. § 35.160(b)(2). However, the Attorney General's section-by-section analysis of this provision recognizes that the individual's request need not be honored if "another effective means of communications exists." 28 C.F.R. app. § 35.160. While "[d]eference to the request of the individual is *desirable*," it is by no means required. *See id.* (emphasis added). As a result, Spurlock's testimony as to the applicable legal standard was plainly erroneous, thus demonstrating the danger in allowing experts to testify as to their understanding of the law. *See Torres,* 758 F.2d at 150. Each courtroom comes equipped with a "legal expert," called a judge, and it is his or her province alone to instruct the jury on the

relevant legal standards. *See Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 509–10 (2nd Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

Even aside from Spurlock's erroneous formulation of the pertinent law, we are also troubled by Spurlock's testimony that Officer Gray's communications with Burkhart were not "as effective" as the means of communication with others. The phrase "as effective" is lifted directly from the text of the Attorney General's regulations implementing the ADA. 28 C.F.R. § 35.160(a). Moreover, the phrase as used in the regulations is a term of art with a meaning "separate" and "distinct" from the vernacular. *Torres,* 758 F.2d at 151. Whether a particular form of communication is "as effective" as another is not judged on an absolute scale, but rather is a contextual determination based on the type of communication and number of people involved as well as the importance of the communication. *See* 28 C.F.R. app. § 35.160 (explaining that the "factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication"). Therefore, by invoking a legal term of art, Spurlock's testimony constituted an impermissible legal conclusion. *See Torres,* 758 F.2d at 151 (finding inappropriate testimony that a defendant did not "discriminate").

It may well be permissible for an appropriate [3] expert to testify as to the difficulty an individual like Burkhart would have communicating with Officer Gray under the circumstances. It may also be permissible for an appropriate expert to testify concerning the relative merits of alternative forms of communication. But by allowing Spurlock to testify as to the legal question at issue, the trial court erred.

Spurlock also testified that Officer Gray was "not ... trained to proficiency in the requirements of the [ADA]" and the Rehabilitation Act. Again, the phrase "trained to proficiency" is lifted directly from the text of one of the regulations implementing the

---

3. We question Spurlock's expertise in the area of communications with the disabled.

ADA, 49 C.F.R. § 37.173, and is a legal term of art defined by context, *id.* app. § 37.173 (stating that "training must be appropriate to the duties of each employee"). By invoking this nuanced statutory term, Spurlock again offered an impermissible legal conclusion.

As a final example of impermissible expert testimony we note Spurlock's response to the question: "Were all proper police practices— with respect to the ADA and the Rehabilitation Act and in the national standards thereby, were all the police practices in this case proper?" Spurlock responded to this question by stating that Officer Gray should have, but failed to "gain control of the situation so that any combatants no longer cause harm to each other." Spurlock further testified that Officer Gray failed to "search for witnesses" and seize relevant evidence. This testimony plainly misstated the requirements of those statutes, as we are unable to identify any provision of the ADA or Rehabilitation Act requiring that such steps be taken.

In sum, we conclude that the trial court abused its discretion in permitting Spurlock to offer legal conclusions and misstate relevant legal principles. We emphasize that our discussion of the improper testimony by Spurlock ·is by no means exhaustive. We have simply highlighted those portions of the testimony we find most troubling. These examples should provide a sufficient guide on remand.

2. Prejudice.

 We, of course, recognize that error alone does not warrant reversal of an otherwise valid judgment. An error that is harmless is not grounds for disturbing a judgment. *See* FED.R.CIV.P. 61. "The burden of demonstrating prejudice requiring reversal rests with the party asserting error." *Hygh v. Jacobs,* 961 F.2d 359, 365 (2nd Cir.1992). We hold that WMATA has carried its burden of proving that Spurlock's erroneously admitted testimony was sufficiently prejudicial to warrant reversal.

In *Hygh,* the Second Circuit considered two factors in assessing whether impermissible expert testimony as to a legal conclusion was harmless. At issue in that case was testimony by an expert concerning whether

the force used by certain police officers in affecting an arrest was excessive. *Id.* at 361–62. In concluding that the testimony was harmless, the court first noted that the "impermissible testimony was expressed within a larger body of otherwise unobjectionable testimony concerning police procedures ... from which the jury could easily have drawn the same conclusions that [the expert] did." *Id.* at 365; *see also Faison v. Nationwide Mortgage Corp.,* 839 F.2d 680, 690 (D.C.Cir.1987) (finding expert testimony harmless in that it "merely augmented other pattern evidence"), *cert. denied,* 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 46 (1988). In addition, the court relied on the fact that the evidence supporting the expert's legal conclusion was "strong." 961 F.2d at 365; *see also United States v. Smart,* 98 F.3d 1379, 1381 (D.C.Cir.1996) (finding erroneous expert testimony harmless given extensive evidence of guilt), *cert. denied,* —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997). Neither factor is present here.

Even setting aside his misstatements of the law itself, Spurlock's impermissible legal conclusions were not "expressed within a larger body of otherwise unobjectionable testimony from which the jury could easily have drawn the same conclusions that the expert did." For example, Spurlock testified that the means of communication employed by Officer Gray were not "as effective" as the means of communication with others. However, Spurlock did not provide other testimony to support this legal conclusion. Indeed, the facts indicate that Burkhart's difficulty, if any, in communicating with Officer Gray arose not because written means of communication were used, but because the communications were written *in English* rather than Spanish. Lack of fluency in English, of course, is not a disability within the meaning of the ADA or Rehabilitation Act.

Moreover, the evidence of ADA and Rehabilitation Act violations in this case can hardly be described as "strong." Both the ADA and Rehabilitation Act prohibit discrimination "by reason of" a disability. 42 U.S.C. § 12132; 29 U.S.C. § 794. Without deciding whether this language requires a showing of intentional discrimination or whether dis-

criminatory effect alone is sufficient, we note that the evidence that Burkhart was discriminated against "by reason of" his deafness is thin. Indeed, the evidence arguably shows the opposite. At trial, Burkhart introduced evidence of Smith's prior employment history, including his previous confrontations with passengers. There is no indication that these prior confrontations involved disabled persons. Further, there is no evidence that Salman, who was also deaf, was subject to abusive treatment by Smith. These facts indicate that it was Smith's general rudeness that caused Burkhart to suffer humiliation, not discrimination "by reason of" Burkhart's disability. Unfortunately for Burkhart, general rudeness towards all does not violate either the ADA or Rehabilitation Act. *Cf. McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1195–96 (4th Cir.) (holding that Title VII does not generally prohibit rudeness at the workplace, but only that based on sex), *cert. denied,* —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996). In addition, as discussed at length above, there is little to no evidence supporting Burkhart's claim that he was denied "as effective" communication aside from the impermissible legal conclusions rendered by Spurlock.

Given the scarcity of evidence of ADA and Rehabilitation Act violations and the lack of admissible testimony in support of Spurlock's legal conclusions, we cannot conclude that the improper expert testimony in this case was harmless.

### B. Negligent Hiring, Training, and Supervision Claims.

WMATA also urges that we reverse the judgment of the district court as to the negligent hiring, training, and supervision claims.

#### 1. Duplicity.

■ WMATA argues that the district court erred in denying its motion to dismiss the claim for negligent hiring, training, and supervision. According to WMATA, permitting Burkhart to present claims against the Authority both for assault and battery, and negligent hiring, training, or supervision was duplicative. WMATA conceded that Smith was acting within the scope of his employ-

ment. Thus, the negligent hiring claim created no additional liability. It did, however, allow for admission of otherwise inadmissible evidence of prior unrelated passenger complaints involving Smith. *See* FED.R.EVID. 404 (evidence of prior bad acts is inadmissible in order to show action in conformity therewith). WMATA therefore contends that it was error to allow both claims to go to the jury.

The magistrate judge denied WMATA's motion to dismiss the negligent hiring claim as untimely. Local Rule 108(*l*) provides that "[a] dispositive motion in a civil action shall be filed sufficiently in advance of the pretrial conference." It is undisputed that WMATA's motion was filed one week prior to trial, well after the pretrial conference. Instead, WMATA argues that Rule 108(*l*) is inapplicable in that its motion to dismiss was not a "dispositive motion." According to WMATA, only those motions that "obviate[ ] the need for a trial" are "dispositive." Since dismissal of the negligent hiring claim would not have eliminated the need for a trial on the other claims, WMATA contends that its motion was not dispositive and thus not governed by Rule 108(*l*). This argument is plainly without merit.

A motion need not "obviate the need for a trial" to be dispositive. The term "dispositive motion" includes a motion that, if granted, would result either in the determination of a particular claim on the merits or elimination of such a claim from the case. For example, a court may grant a partial summary judgment as to fewer than all the claims in a case. A grant of partial summary judgment often leaves necessary a trial to resolve the remaining claims. *See* FED. R.CIV.P. 56(d). We, however, have referred to partial motions for summary judgment as "dispositive motions." *E.g., Nixon v. Freeman,* 670 F.2d 346, 364 (D.C.Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982).

In this case, WMATA's motion, if granted, would have eliminated the negligent hiring claim from the case. It was, therefore, clearly a dispositive motion for purposes of Rule 108(*l*). WMATA conceded at trial that its motion to dismiss was untimely. As a result,

we cannot say that the trial court abused its discretion in denying the motion as untimely.[4] The fact that the trial court alternatively rejected WMATA's motion on the merits in no way undermines the timeliness ruling. *United States v. Sobin,* 56 F.3d 1423, 1427 & n. 4 (D.C.Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 348, 133 L.Ed.2d 244 (1995). We therefore reject WMATA's claim despite serious reservations concerning the trial court's alternative denial of the motion on the merits. *See Hackett v. WMATA,* 736 F.Supp. 8 (D.D.C.1990).

2. Sovereign Immunity.

■■■■■ Because WMATA waived its duplicity claim, we are forced to consider WMATA's claim that it is immune from suits challenging its hiring, training, and supervision practices. This argument was raised below in the same untimely motion in which WMATA moved for dismissal of the negligent hiring claim as duplicitous. However, sovereign immunity claims are jurisdictional and thus cannot be waived by failure to present the defense to the trial court. *See Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) (holding that Eleventh Amendment claim cannot be waived as it is jurisdictional).

WMATA was created as the result of a compact signed by Maryland, Virginia, and the District of Columbia and consented to by Congress (the "WMATA Compact"). Pub.L. No.89–774, 80 Stat. 1324 (1966) (codified as amended at D.C.CODE § 1–2431 *et seq.*). The WMATA Compact provides that "[t]he Authority shall be liable ... for its torts and those of its Directors, officers, employees and agents committed in the course of any proprietary function ... but shall not be liable for any torts occurring in the performance of a governmental function." D.C.CODE § 1–2431(80).

We have developed two alternative tests for identifying "governmental" functions under the WMATA Compact. *Dant v. District of Columbia,* 829 F.2d 69 (D.C.Cir.1987). If an activity is a "quintessential[ ] governmental" function, such as "police activit[y]," it is within the scope of WMATA's sovereign immunity. *Id.* at 74. For those activities that are not quintessential governmental functions, immunity will depend on whether the activity is "discretionary" or "ministerial," *id.,* a dichotomy employed by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) *et seq.* Only those activities considered "discretionary" are shielded by sovereign immunity. *See Dant,* 829 F.2d at 75.

Appellees cite our opinion in *Biscoe v. Arlington County,* 738 F.2d 1352 (D.C.Cir. 1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985), for the proposition that supervising and instructing employees is a ministerial function. In *Biscoe,* we held that, under D.C. law, the activities of "supervising and instructing" police officers are ministerial in that they "involve day-to-day operational matters, not planning and policy." *Id.* at 1363. However, in *United States v. Gaubert,* 499 U.S. 315, 323, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991), the Supreme Court held that discretionary activity, for purposes of the FTCA, can include operational activities and "is not confined to the policy or planning level." Thus, the foundation upon which we based our discretionary/ministerial distinction in *Biscoe* was repudiated as a matter of federal law in *Gaubert.* We do not mean to imply that *Biscoe* is no longer binding precedent as to the definition of ministerial and discretionary activities under District of Columbia law. However, the question of whether an activity is a governmental function for purposes of the WMATA Compact "is one of federal law." *Sanders v. WMATA,* 819 F.2d 1151, 1154 (D.C.Cir.1987). Therefore, *Gaubert,* not *Biscoe,* must guide our determination of whether hiring, training, or supervising employees are discretionary functions for purposes of the WMATA Compact.

In *Gaubert,* the Supreme Court stated that a discretionary function "is one that involves choice or judgment" exercised "based on con-

4. Our concurring colleague concludes that the negligent hiring, training, and supervision claims were duplicative of the assault, battery, and infliction of emotional distress claims. Concurring Opinion at 1218. However, our colleague fails to explain how he would overcome the procedural hurdles that bar consideration of WMATA's duplicity argument.

siderations of public policy." *See* 499 U.S. at 322, 111 S.Ct. at 1274. A two-part test flows from this definition of a discretionary activity. *Cope v. Scott,* 45 F.3d 445, 448 (D.C.Cir. 1995). First, a court must determine whether a " 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' " *Id.* (quoting *Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273). If so, sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct. *Id.* If, however, the governing statutes leave room for "choice," an exercise of such choice is exempt from suit under the FTCA if the decision is " 'susceptible to policy judgment' and involve[d] an exercise of 'political, social, [or] economic judgment.' " *Id.* (quoting *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275).

Applying this test, we hold that decisions concerning the hiring, training, and supervising of WMATA employees are discretionary in nature, and thus immune from judicial review. The parties have pointed to no law or policy "specifically prescrib[ing]" guidelines for the hiring, training, or supervision of WMATA employees. The WMATA compact confers upon WMATA broad power to "[c]reate and abolish ... employments" and "provide for the qualification, appointment, [and] removal ... of its ... employees without regard to the laws of any of the signatories," D.C.CODE§ 1–2431(12)(g); "[e]stablish, in its discretion, a personnel system based on merit and fitness," *id.* § 1–2431(12)(h); and "[c]ontrol and regulate ... the service to be rendered," *id.*§ 1–2431(12)(j). These provision hardly constrain WMATA's determination of whom it will employ or how it will train and supervise such employees. Thus, WMATA has choices to make.

The hiring, training, and supervision choices that WMATA faces are choices "susceptible to policy judgment." The hiring decisions of a public entity require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, "individual backgrounds, office diversity, experience and employer intuition." *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995). Similarly, supervision decisions involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety. The extent of training with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past. Such decisions are surely among those involving the exercise of political, social, or economic judgment. *See, e.g., Kirchmann v. United States,* 8 F.3d 1273, 1277 (8th Cir.1993) (holding that supervision of government contractors is a "discretionary function"); *Tonelli,* 60 F.3d at 496 (stating that "issues of employee supervision and retention generally fall within the discretionary function exception"); *K.W. Thompson Tool Co. v. United States,* 836 F.2d 721 (1st Cir.1988) (holding that "failure to properly train and supervise EPA personnel" falls within the discretionary function exception).

As a result, we conclude that the hiring, training, and supervision of WMATA personnel are governmental functions. WMATA is therefore immune from suit for negligence in the performance of such functions. The district court erred in refusing to dismiss Burkhart's negligent hiring, training, and supervision claims against WMATA.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court as to the assault, battery, and infliction of emotional distress claims. We reverse the judgment of the district court as to the negligent hiring, training, and supervision claims, as well as the ADA and Rehabilitation Act claims. Because WMATA is immune from suit for negligent hiring, training, and supervision, we remand the case for retrial only of the ADA and Rehabilitation Act claims.

HARRY T. EDWARDS, Chief Judge, concurring:

I agree with the majority that plaintiff's claim of negligent hiring, supervision, and training by the Washington Metropolitan Area Transit Authority ("WMATA") should never have been submitted to the jury.

On the principal point in issue, I am satisfied that the jury was fully justified in returning a verdict against WMATA on plaintiff's claim that WMATA violated the Americans With Disabilities Act and the Rehabilitation Act of 1973. There is substantial evidence to support the verdict on this claim, even absent the disputed testimony of plaintiff's expert witness. The record establishes that, after boarding the bus and attempting to pay his fare, the plaintiff was slapped in the face by a WMATA bus operator, who apparently had become frustrated when the plaintiff, who is deaf, did not understand his oral commands. *See* Transcript at 75, 135, *reprinted in* Joint Appendix Volume II ("J.A. II"). Further, the record demonstrates that, after the plaintiff left the bus and located a transit officer so that he could report that the bus driver had struck him, the officer refused the plaintiff's request for a sign-language interpreter and, instead, compelled him to write notes in English. *See id.* at 80–82, 95, 171–76, *reprinted in* J.A. II. Written English is the third most comfortable language for the plaintiff, behind American Sign Language and written Spanish. *See id.* at 194, *reprinted in* J.A. II. This and other similar evidence offered by the plaintiff make it clear that there was sufficient evidence to support the jury's verdict. Thus, I believe that, without the erroneous admission of the expert's testimony, the plaintiff would prevail on his principal claim.

I agree, however, that the error in this case was not harmless. As I understand the "harmless error" doctrine, it is not within the province of an appellate judge to usurp the role of a jury by speculating on what a jury might have done in the absence of significant error. *See* Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. REV. 1167, 1193–94, 1205 (1995). Our role is to assess "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict,' not whether the record evidence is sufficient absent the error to warrant a verdict." *Id.* at 1202 (footnote omitted) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 434–36, 115 S.Ct. 992, 994, 130

L.Ed.2d 947 (1995)). In this case, it cannot be said that the error did not have a substantial and injurious effect on the verdict.