**UNITED STATES of America and Government National Mortgage Association, Appellees**

v.

**John C. YORK, *et al.*, Appellants**

**Nos. 95–5243, 95–5244 and 95–5279.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 1997.

Decided May 16, 1997

Louis R. Cohen, Washington, DC, argued the cause for appellants First Commonwealth, FSB, et al., with whom David P. Donovan, Leon B. Greenfield, Jonathan J. Frankel, Washington, DC, and John J. Knapp, Potomac, MD, were on the briefs.

Steven D. Gordon, Washington, DC, argued the cause for appellant USGI, Inc., with whom Michael L. Martinez and Gloria B. Solomon were on the briefs.

Dara A. Corrigan, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, Barbara E. Nicastro, and Jeffrey T. Sprung were on the brief. Mark E. Nagle, Assistant United States Attorney, Washington, DC, entered an appearance.

Before EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

These consolidated cases come to us on appeal from the district court's grant of summary judgment in favor of the government. The district court held that appellant York Associates' participation in certain transactions violated a fiduciary duty it owed to the Government National Mortgage Association ("GNMA"). The district court imposed heavy financial penalties on York Associates itself and several other involved parties.

We hold that York Associates owed GNMA no duty to refrain from participating in the transactions in question. The district court's grant of summary judgment to the government is therefore reversed, and the district court is ordered to enter summary judgment in favor of appellants.

## Background

GNMA is a wholly-owned government corporation within the Department of Housing and Urban Development ("HUD"). GNMA's statutory mission is to facilitate private investment in low to moderate income housing developments. 12 U.S.C. § 1716. It accomplishes this goal largely through the use of mortgage-backed securities.

A mortgage-backed security is a long-term debt instrument that represents the income stream from one or more mortgages. Mortgage banking institutions issue mortgage-backed securities and sell them to investors. The cash from these sales is used to make mortgage loans. The payments borrowers make on these mortgage loans form the income stream for the holders of the securities. The banking institutions that originate

mortgage loans and issue mortgage-backed securities are known as "issuers." Issuers commonly earn an administrative fee by servicing the securities, i.e., processing loan repayments and directing them to security holders.

Under the program involved in this case, mortgage-banking institutions apply to GNMA for approval to issue GNMA mortgage-backed securities ("GNMA securities"). GNMA securities are backed by the full faith and credit of the United States. Obviously, this makes these securities far more attractive in the open market than they otherwise would be. The mortgages which underlie the GNMA securities must be insured by the Federal Housing Administration ("FHA") or some similar government-sponsored insurance program. The FHA insures originators of covered mortgages for up to 90% of the amount of the loan.

GNMA securities are widely traded in secondary markets. Because they are fixed-rate securities their market value depends on current market interest rates. If current rates are above the fixed rate on the security, it will ordinarily trade below face value. If current rates are below the fixed rate, it will ordinarily trade above face value.

GNMA securities have one other feature central to this case. If the underlying mortgage loan is paid before its maturity, the security becomes immediately payable at full face value. There are two ways in which an underlying loan can be paid before maturity. The first is if the borrower happens to come up with the funds. The second is if the borrower defaults. In the event of a default, the mortgage lender can foreclose upon and sell the property and then collect the FHA insurance for up to 90% of the deficiency amount. Once the insurance proceeds are collected, the mortgage lender/GNMA security issuer is obligated to pay the GNMA security at its full face value. This process takes anywhere from six months to two years. If the GNMA security holder originally purchased the security below face value, payment at full face value results in a potentially significant windfall gain.

Appellant York Associates was a GNMA-approved issuer. At all times relevant to this case, appellant John York was a 65% shareholder as well as President and chief executive officer of York Associates. This consolidated case arises out of two transactions in GNMA securities in which York Associates was involved:

### 1. *The Quail Run Transaction*

DRG Funding Corp. ("DRG") was a mortgage banking institution unrelated to any of the appellants in this case. DRG was a large-scale issuer of loans and securities in the GNMA program. In 1988 DRG defaulted under its guaranty agreements with GNMA, and its mortgages and securities became the responsibility of GNMA.

GNMA sought bids from other approved issuers for a subservicing contract for the DRG portfolio. York Associates submitted a bid and won the contract. It entered into a Sub–Contract Servicing Agreement ("Agreement") with GNMA in September 1988. The Agreement gave York Associates servicing responsibilities for the DRG portfolio and custody of all of DRG's loan records.

On October 27, 1988, John York and his partner met with an official from appellant USGI, Inc. ("USGI"), a mortgage banking institution. The parties at this meeting discussed an arrangement whereby they would seek opportunities to acquire GNMA securities that were likely to prepay. One element of the discussed arrangement was that USGI would purchase securities that York Associates serviced. USGI would get information from York Associates about which of the loans in its portfolio were likely to prepay. The parties discussed splitting profits from the redemption of these securities 75% to York Associates and 25% to USGI.

Shortly after this meeting, USGI learned of the availability of a GNMA security backed by a Wyoming property called Quail Run. USGI contacted York Associates about the status of the Quail Run security. York Associates told USGI that the Quail Run security was part of the DRG portfolio that York Associates now serviced. It also told USGI that the Quail Run loan had already been foreclosed and that a claim for FHA insurance benefits was being prepared. The

security was therefore extremely likely to prepay. York Associates garnered this information from the DRG loan records it acquired as part of its Sub–Contract Servicing Agreement with GNMA.

On December 9, 1988, USGI purchased the Quail Run security from Salomon Brothers ("Salomon") and on the same day sold it to appellant First Commonwealth Savings Bank ("First Commonwealth"). John York was Chairman of the Board and a 65% shareholder of First Commonwealth.

On January 20, 1989, York Associates, as sub-servicer for GNMA on the DRG portfolio, filed a claim for FHA coinsurance on the Quail Run mortgage. FHA disbursed the insurance proceeds to York Associates in October 1989. At this point, the security was eligible to be redeemed at par.

Prior to redemption, however, First Commonwealth had sold the Quail Run security back to USGI. The redemption payment was therefore made to USGI. First Commonwealth and USGI split the redemption profits, i.e., the difference between the price at which USGI bought the security from Salomon and its redemption price, 75%–25%.

York Associates never informed the government that its affiliate had an ownership interest in a security it serviced. No government regulation expressly forbids this practice. The government stipulated that GNMA suffered no direct financial loss as a result of the transactions in the Quail Run security among Salomon, USGI, and First Commonwealth.

### 2. The Forest Isle Transaction

In 1985, York Associates made a HUD-coinsured loan to an investor in the Forest Isle Apartments and issued a GNMA security in the face amount of the loan. In 1987, the investor informed York Associates that he would default on the loan. York, which stood to lose that portion of its loan that was not FHA-insured, restructured the loan by purchasing the project through an affiliated partnership, making a new FHA-insured loan to the partnership, and issuing a new GNMA security. York sold the Forest Isle security to Salomon.

Later in 1987 Salomon contacted John York and made an offer to sell a portion of the Forest Isle security. Thinking that the property was likely to prepay and that he would therefore be able to benefit from the difference between the purchase price and par value, York decided to buy the Forest Isle security. On February 11, 1988, he arranged for First Commonwealth to purchase from Salomon all but a $500,000 share of the Forest Isle security. A religious organization owned the remaining portion. On March 9, 1988, Salomon bought the remaining portion of the security and on that same day sold it to First Commonwealth.

Around this same time, John York concluded that Forest Isle could not generate sufficient revenue to sustain its debt servicing requirements and that the mortgage would have to default. He discontinued further advances by York Associates for the project's operating deficits. This caused a default under the loan. In April 1988, York Associates filed a claim for FHA coinsurance benefits on the Forest Isle project. In October 1988, HUD paid these benefits to York Associates. This payment triggered redemption of the Forest Isle GNMA security that First Commonwealth now owned. First Commonwealth collected $765,681 more in redemption proceeds than it paid for the security. The government stipulated that GNMA suffered no direct financial loss as a result of the transaction in the Forest Isle security between Salomon and First Commonwealth.

### Proceedings Below

York Associates initiated these proceedings. Between 1983–89, it made numerous FHA-insured mortgage loans that went into foreclosure. It received FHA mortgage insurance proceeds on these loans but sued HUD claiming that it was statutorily entitled to receive an additional amount in interest. The district court issued a declaratory judgment that York Associates was entitled to this interest. *York Assocs., Inc. v. HUD,* 820 F.Supp. 14 (D.D.C.1993).

The court declined, however, to order HUD to pay York Associates immediately. In an amended answer and counterclaim, the

government asserted that York Associates had engaged in "breach of contract, insider trading, and unjust enrichment" and had "unclean hands" because it had purchased the Forest Isle certificate while in possession of "material, non-public information" that the security would prepay. The amended answer made similar allegations about trading in the Quail Run security. In addition, the government filed a new suit charging that John York, First Commonwealth, and USGI had each "induced" York Associates' breach of duty and were therefore jointly liable. Because the resolution of the government's charges could affect what York Associates was owed, the court did not make the government pay immediately. It instead consolidated the two cases.

Each side filed for summary judgment in the consolidated case. The court ruled for the government. It first held that York Associates violated a fiduciary duty it owed to GNMA when it purchased the Quail Run certificate, because it "acquir[ed] an interest in conflict with the interests of the United States." *United States v. York*, 890 F.Supp. 1117, 1126 (D.D.C.1995) (citing *United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910)). The court ordered disgorgement of the profit York Associates made on the trading of the Quail Run certificate. Finding that disgorgement was "not a sufficient remedy to 'provide a means of enforcing the loyalty of [the government's] agents,'" the district court also ordered forfeiture of the $5,874,531.87 in fees York Associates earned under the Sub–Contract Servicing Agreement. *Id.* at 1131–32 (quoting *United States v. Kearns*, 595 F.2d 729, 734 (D.C.Cir.1978)) (alteration in original).

The court further held that John York, First Commonwealth, and USGI had induced the breach and were therefore jointly and severally liable for the disgorgement. *Id.* at 1128 n. 15. It also held these other parties jointly and severally liable for the $5.9 million in fees. *Id.* at 1139.

The court then turned to the Forest Isle transaction. It first held that issuers of GNMA securities are GNMA's agents. *Id.* at 1132. An agent owes its principal a fidu-

ciary duty. "York Associates' purchase and redemption of the Forest Isle security created a conflict of interest in violation of its fiduciary duty owed GNMA as an issuer of [GNMA] securities." *Id.* at 1135.

It then held that York Associates' participation in these two transactions gave it "unclean hands" in its statutory claim for interest on the FHA insurance proceeds. *Id.* at 1137. The court therefore refused to order HUD to pay York Associates the approximately $4.6 million in interest to which it was otherwise statutorily entitled.

Appellants moved the court to alter or amend the judgment. The district court denied their requests in a separate memorandum opinion. *Id.* at 1139–43. This appeal followed.

### Analysis

The district court's opinion is based on two legal conclusions. The first is that York Associates was acting as GNMA's agent in both the Forest Isle and the Quail Run transactions. The second is that York Associates' participation in these transactions breached a fiduciary duty it owed to its principal, GNMA.

In their brief to this court, the York parties[1] challenge both of these conclusions. They first contend that issuers of GNMA securities are not necessarily GNMA's agents. While the Sub–Contract Servicing Agreement may have created an agency relationship as regards Quail Run and the other securities in the DRG portfolio, there is nothing to suggest that York Associates was acting as GNMA's agent in issuing and servicing the Forest Isle security. They next contend that even if York Associates had been GNMA's agent for purposes of both securities, nothing it did in either transaction breached any duty it owed to GNMA. In this second contention they are joined by appellant USGI.

The government disagrees. It argues that York Associates was GNMA's agent as regards both the Quail Run and the Forest Isle securities. York Associates violated the fidu-

---

1. York Associates, John York, and First Com-  monwealth submitted a single brief.

ciary duty it owed to its principal GNMA by trading in these securities. The government, following the district court, relies on *United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910). *Carter* held that a government agent breaches its fiduciary duty when it "acquires any interest adverse to [its] principal, without a full disclosure." *Id.* at 306, 30 S.Ct. at 520.

We hold in favor of appellants. Even assuming *arguendo* that York Associates was GNMA's agent as regards both of these securities, the government can identify no duty that was breached. It repeatedly asserts that York Associates' position was adverse to that of GNMA, but it never defensibly articulates how this is so. The government concedes that the York parties' involvement in these transactions caused GNMA no direct financial loss. It must therefore develop an alternate theory of the duty that York Associates breached. *See United States v. Kearns*, 595 F.2d 729, 734 (D.C.Cir.1978) ("Valid policy concerns underlie the insistence that a plaintiff in an action for breach of fiduciary duty need not demonstrate actual damage or abuse of office."). There are at least four possibilities. None of the four, however, ultimately succeeds.

■ The first possibility is that York Associates had a duty to keep confidential the loan default information from the DRG portfolio that it received as part of the Sub–Contract Servicing Agreement. If York Associates had such a duty, it breached it when it shared information with USGI. The government argues that the Agreement itself established this duty. It points in particular to the sentence that reads "[York Associates] shall receive all such property and information for the purpose of performing its duties under this Agreement." The government interprets this sentence to mean that the information was given to York Associates for the purpose of performing its duties under the Agreement, and for that purpose alone. The district court interpreted this sentence in a similar fashion. *York*, 890 F.Supp. at 1127.

The government and the district court misinterpret the Agreement. The relied-upon sentence says nothing about confidentiality. Given GNMA practice at the time, it would be irrational to interpret the sentence to create a duty of confidentiality. Far from demanding that issuers keep loan information confidential, GNMA actually required issuers to disclose this information to holders of GNMA securities who requested it. GNMA Prospectus, Appendix 25 to GNMA Handbook 5550.1 Rev. 6 (April 1984) ("The accounts and records [of the issuer] relating to the pooled mortgages shall be maintained in accordance with sound accounting practices and in a manner that will permit representatives of GNMA at any reasonable time to examine and audit such accounts and records."). In addition, Robert P. Kalish, the Executive Vice President of GNMA, testified that GNMA generally left it up to the issuer whether loan default information should be disclosed to third parties. Deposition of Robert P. Kalish, Executive Vice President of GNMA, February 4, 1994, at 12. The Sub–Contract Servicing Agreement did not impose a duty to keep loan default information confidential.

■ The second possibility is that GNMA has administratively imposed on issuers a duty to refrain from trading in their own securities. At the time the transactions in question took place, no formal rule prohibited this behavior, nor has any such rule since been promulgated. The government argues, however, that it administratively established this prohibition in 1976, when it sent a letter censuring an issuer who solicited sales of securities about which it had inside information. This letter, however, was never published. York cannot be held accountable for adherence to a GNMA policy that was never made public. *Satellite Broadcasting Co., Inc. v. FCC*, 824 F.2d 1, 3 (D.C.Cir.1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule."). GNMA has not administratively imposed on issuers a duty to refrain from trading in the securities they issue.

The third possibility is that the securities laws and their accompanying regulations impose a duty on issuers to refrain from trading in the securities they issue and service.

The government, however, does not make this argument. The Securities and Exchange Commission investigated York Associates' involvement in these transactions, but declined to take any action.

■ A theoretical fourth possibility is that York Associates breached a fiduciary duty by undermining GNMA's statutory goal of encouraging private investment in low to moderate income housing. This theory is based on a novel and unconvincing economic argument advanced by the government. By "cherry-picking" those securities that were just about to pay a premium, so the theory goes, York Associates deterred others from investing in the GNMA security market. If investors know that subservicers and issuers are able to take advantage of their position to harvest pre-payment premiums for themselves, then the incentive to invest will be diminished. York Associates' involvement in these transactions therefore directly undermines GNMA's goal of generating funds for the housing market through private investment in GNMA securities. York Associates' position is adverse to that of its principal. Under *Carter*, this is enough to establish a breach of the government agent's fiduciary duty to its principal.

The district court relied on this theory as an alternate ground for its holding of liability. In doing so, the court noted that "based on the record alone, this harm to the market is speculative." *York*, 890 F.Supp. at 1130. Nothing in the record supports the government's theory that York Associates' involvement in these transactions harmed the market for GNMA securities. In the absence of such support, we cannot use this theory to find that York Associates breached a fiduciary duty by taking a position that was "adverse" to that of its principal GNMA. We will not simply assume that introducing this category of buyers into this securities market would suppress investment in that market.

Our conclusion, therefore, is that York Associates owed GNMA no duty to refrain from the behavior that the government now challenges. No contractual provision, GNMA regulation, or federal law prohibited York Associates from disclosing information from the DRG portfolio or purchasing securities

for which it served as issuer or subservicer. York Associates did not assume a position that was "adverse" to that of its principal GNMA. The government concedes that York Associates' involvement in the Quail Run and the Forest Isle transactions did not cause GNMA any direct financial harm. There is inadequate record support for the contention that York Associates' behavior directly or indirectly weakened the market for GNMA securities.

Finding that York Associates breached no duty it owed to GNMA, we reverse the district court's grant of summary judgment to the government. We order instead that summary judgment be entered in favor of appellants. First Commonwealth, John York, York Associates, and USGI are freed of all liability. The case is remanded to the district court for calculation of the precise amount of mortgage insurance interest that York Associates is owed. *See York Assocs.*, 820 F.Supp. at 18.

■ Because we find that York Associates owed GNMA no duty to refrain from engaging in these transactions, we need not reach the portion of the district court's opinion dealing with damages. We note, however, that the district court applied novel interpretations of, *inter alia*, the law of disgorgement, the concept of joint and several liability, and the doctrine of unclean hands. Our failure to discuss this portion of the opinion is not to be interpreted as endorsement of the district court's analysis.

**Conclusion**

The district court's grant of summary judgment for the government was based on its holding that York Associates breached a fiduciary duty it owed to its principal GNMA. Concluding that York Associates owed GNMA no duty to refrain from engaging in the behavior that is challenged in this case, we reverse the district court's grant of summary judgment in favor of the government and order instead that summary judgment be entered in favor of appellants. The case is remanded to the district court for a precise

calculation of the amount of HUD insurance interest that York Associates is owed.